IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DEREK MARTINEZ,

Petitioner,

vs.

SCOTT FRAUENHEIM, Warden,
Pleasant Valley State Prison,[1]

Respondent.

No. 2:12-cv-02273-JKS

MEMORANDUM DECISION

Derek Martinez, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas

Corpus with this Court pursuant to 28 U.S.C. § 2254.  Martinez is in the custody of the

California Department of Corrections and Rehabilitation and incarcerated at Pleasant Valley

State Prison.  Respondent has answered, and Martinez has replied.

I.  BACKGROUND/PRIOR PROCEEDINGS

On September 29, 2004, Martinez, along with co-defendant Michael Johnson, was

charged with the murder of Chris Kohn after his former wife informed police 7 years after

Kohn's death that Martinez had earlier confessed to her that he and Johnson killed Kohn.  The

information also alleged that a principal was armed with a firearm.  As to Martinez, the

information further alleged that he personally used a firearm during the commission of the

offense and previously had been convicted of one serious and/or violent felony within the

---

[1]      Scott Frauenheim, Warden, Pleasant Valley State Prison, is substituted for the
California Department of Corrections & Rehabilitation.  FED. R. CIV. P. 25(c); Rule 2(a), Rules
Governing Section 2254 Cases in the United States District Courts; *Stanley v. Cal. Supreme
Court*, 21 F.3d 359, 360 (9th Cir. 1994).

meaning of the three strikes law (CAL. PENAL CODE § 1170.12).  Both Martinez and Johnson

entered not guilty pleas and denied the allegations.

On direct appeal of his conviction, the California Court of Appeal recounted the

following facts underlying the charges against Martinez:

## FACTS

### Christopher Kohn and the Super Bowl Sunday Burglary

Christopher Kohn lived on Wonderland Boulevard in Mountain Gate in a house that had been converted into three studio apartments.  Kohn did not work, but sold marijuana; he had 20 to 30 visitors a day.  He flashed around a lot of money; everyone knew he had money.

January 26, 1997 was Super Bowl Sunday.  While Kohn was at the Red Lion Inn celebrating, his apartment was burglarized and ransacked.  Several items were stolen, but not his money.

On January 29, several people visited Kohn and some purchased marijuana.  One visitor watched a man sell Kohn a pound of marijuana, which Kohn paid for.  Kohn had $9,000 in his couch and a stack of money in a wooden box.  When two potential purchasers arrived about 10:00 p.m., Kohn sent them away.  Kohn's girlfriend called about the same time and Kohn sounded fine.

### Kohn's Neighbors Hear the Killing

When Kohn's neighbor Sandra Drewek got home from work about 10:30 or 11:00 that night, it was quiet.  Later, through the thin walls, she heard three male voices from Kohn's apartment.  It sounded like they were partying.  She was awakened at 4:20 a.m. by the sound of a body hitting the wall.  She heard Kohn screaming for help.  She heard one man say "don't do that" and another say there was a girl next door.  She heard Kohn call for help in a low and shallow voice and called 911.  Then she heard a shot.  A spent bullet was found on her bed.

The neighbor who lived in apartment 3 heard a lot of thumping and screams at 4:30 a.m.; it sounded like a bad fight.  He opened his door and saw someone being thrown against the blinds.  He heard someone say "shut up" and then Kohn screaming in a muffled voice.

### Initial Police Investigation and Forensic Evidence

When the police arrived they found Kohn lying near the north wall of the apartment.  His face was bloody and he was dead.  There was no sign of a forced entry, but it was obvious there had been an assault.  There were several cuts on Kohn's head and face and a possible defensive wound on his arm.  The evidence also suggested ligature strangulation.  There were bloody palm prints on the wall.  These prints were later identified as Johnson's.

There was a bullet hole leading to apartment 2.  The bullet was fired from a steep upwards angle and landed on the bed in apartment 2.  The bullet could have come from any of several guns; it would fit a .38, .357, .380 and a 9 millimeter.  It was not fired from any of the guns recovered during the investigation.

Three pieces of black plastic were found on the bed and floor in Kohn's apartment.  They appeared to be from the grip of a handgun.  They had parallel lines on them that were consistent with the pattern found on Kohn's forehead.  A criminalist testified the wounds to Kohn could have been caused by a Walther P-38 handgun.  The identity of that gun was not conclusive, but the criminalist knew of no other gun with that distinctive pattern on the grip.  A factory authorized Walther dealer testified for the defense that these plastic pieces were from a handgun grip and the Walther was the only gun he knew of with a ribbed grip.  He had no doubt the pieces came from a Walther P-38.  The dealer testified, however, that the bullet found in the next apartment had land and groove parameters that did not fall within the Walther specifications.  In rebuttal, a criminalist testified the Walther P-38 had a greater range for land and grooves than the dealer testified to.  The bullet was within that broader range and could have been fired from a Walther P-38.

Kohn had hair in his hand, which was consistent with his own.  DNA analysis showed it was Kohn's hair.

Pay/owe sheets were found in Kohn's apartment.  Martinez was not listed on these sheets.  No significant amount of money was found in Kohn's wallet.

In the original investigation, the police interviewed over a hundred people.  One of Kohn's friends told the police Kohn was worried about being killed in the next three days.  Kohn owed people from Oregon $14,000, but he was not afraid because he had the money.

### Suspect John Harris

The police identified several persons of interest, including John Harris.  Harris had burglarized Kohn on Super Bowl Sunday.  Another person of interest was Taskeen Tyler, who committed a burglary in Alta Mesa shortly before Kohn was killed.  Tyler had given Harris the items from that burglary, including guns, ammunition and a Samurai sword, to hold.  Tyler knew Harris was involved in the Super Bowl Sunday burglary.  Harris told Tyler that Kohn had $10,000 but he could not find it.  Harris said he would kill Harris [sic] if he had to for the money.

The morning of the killing, Harris arrived at Tyler's at 6:00 a.m. nervous and agitated.  He told Tyler he had to get the guns because "they killed the boy."  Tyler knew Harris was talking about Kohn.

The police searched Harris's house and found ammunition, marijuana, but no large amount of money.  They found smoking pipes similar to those at Kohn's.  They also found the Samurai sword from the Alta Mesa burglary.

Harris was interviewed and at first denied the Super Bowl Sunday burglary, but ultimately admitted it.  He strongly denied the murder.  Harris said he wanted money but would not kill for it.  Harris had scratches on his face.

The police found no evidence linking Harris to the killing of Kohn and ruled him out as a suspect.  Harris died in 2005.

The police also heard a report that three black men were discussing the killing in a bar in Cottonwood.  They said it was not supposed to happen like that; no one was to get killed.  The police determined the report was not true.

At trial, Harris's former wife Deborah Butler testified for Martinez.  She testified to Harris's plan to rob Kohn on Super Bowl Sunday.  Afterwards, Harris was upset he failed to find the money, pacing the floor and "foaming at the mouth."  He asked his wife where she would hide money.  A few days after Super Bowl Sunday, there were six to eight black men in her house.  She saw guns, knives, a Samurai sword and a white jacket with blood on it.  Harris then folded the jacket so the blood was not visible.  Butler saw Harris throw clothes away and a pair of his tennis shoes was missing.  Butler had told the police about the bloody jacket and missing clothes.  Harris never told his wife he killed Kohn.

### Helena[2] Martinez

The star prosecution witness was Helena Martinez, defendant Martinez's ex-wife.[FN2]  She had lived with Martinez since she was 17.  They married in August of 1997 and divorced before trial.

> FN2.  For ease of reference and clarity, Helena Martinez will hereafter be referred to as Helena.

On June 24, 2004, Helena was going to the Public Safety Building when she saw a flyer regarding the Mountain Gate murder.  The flyer triggered her memory, which was poor.  After talking to her therapist, she went to the police.

She told the police Martinez had told her he committed the murder.  One dawn he woke her up and told her he had been watching a guy in Mountain Gate who owed him money for drugs.  He went to the guy's house and hit him several times in the back of the head with a gun because the guy would not sit still.  While Martinez was hitting his victim, the gun discharged.  The bullet went into the wall.  A neighbor interrupted by turning on a light.  Martinez was dressed in black.  Afterwards he changed the tires on his car.  Martinez told Helena he would kill her if she told anyone.  He said he was with a friend when he did the killing.

In August of 1998, Martinez drove her to some cabins off Interstate 5 and said this is where he killed the guy.  Another time he drove her to a cemetery and said his

---

[2]        The record indicates that Martinez's ex-wife was referred to as "Helena" at trial and on direct appeal.  In his post-conviction briefing, however, Martinez refers to her as "Helana."  To the extent that the Court of Appeal's opinion is quoted, the Court will not alter that court's spelling of her name.  Because Martinez's Petition refers to her as "Helana," the rest of this Court's opinion will use that spelling of her name.

victim was buried there.  Martinez had a headache and seemed sad.  At the time, Helena thought Martinez was just trying to scare her.

Helena testified Martinez had a silver gun with a black handle that had ridges. The handle was broken.  When Helena asked Martinez about the gun, he said he got it cheap and needed it for show to sell drugs.  Martinez also had a small black gun with scratches on it.

Helena reported Martinez and Johnson were friends.  She remembered Johnson coming by four or five times in 1997.

Helena claimed she did not believe Martinez's confession at the time.  She decided it was true when she saw the poster.  She had told a friend about it in 2003. Despite the confession, Helena married Martinez five months later.  In the spring of 1997, Martinez told her the police found the people who did the killing.

Helena admitted she had accused Martinez's mother of molesting her child.  The accusation was based on the child's report.  Helena told her therapist who contacted the police.  After the child said her grandmother had not molested her, Helena let the grandmother watch the children.  Helena claimed she had a good relationship with Martinez's mother.

Helena's original statement to the police was probably videotaped, as was the usual practice, but the tape was lost.  Helena explained that when she originally told the police Martinez said he "just" killed someone, the use of "just" was a reference to Martinez thinking the killing was no big deal not a reference to the timing of the killing.

Helena was interviewed in more depth by Detective Thomas Campbell.  She was very nervous and anxious, but eager to talk.  Campbell asked her if any of Martinez's guns had missing pieces.  She responded one was chipped or scratched.  Campbell showed her a picture of the black plastic pieces found at the crime scene.  She said Martinez's gun had ridges.  When Campbell told her where the pieces were found, she began to cry uncontrollably and urinated on herself.  She was frightened.

Helena gave the detective the names of several of Martinez's friends.  She identified one as Michael Pajarro, but later clarified his last name was Johnson.

### Christina Goodwin

The police then contacted Christina Goodwin in Oregon, looking for Johnson. During a second interview in Redding, the police told Goodwin they had arrested Martinez for murder.  Goodwin had been roommates with Johnson; then they became a couple.  They had an on and off relationship from 1996 to 2004.

Goodwin told the police that one night in 1997 Johnson awoke her when he came home with Martinez.  Johnson was carrying a shotgun wrapped in a blanket and asked her to put it in the shed.  Johnson was wearing dark clothes and gloves.  Johnson threw his clothes in a dumpster.  Johnson was anxious and did not want to talk.  Goodwin described him as acting "sketchy"; he was paranoid and thought people were following him.

Prior to this night Johnson had no money.  Afterwards he gave Goodwin $300 for rent and spent money on clothes, cars and taking another girl out of town.  Johnson also had a large amount of marijuana; it filled the bottom of a large dog food bag.

Goodwin was uncertain of the date of this shotgun incident.  She thought her Christmas tree was still up and she usually took the tree down a week or two after New Year's.  She believed she was six months pregnant and her daughter was born in April.  It could have been the end of January.  She first told the police it was February or March, then she remembered it was cold and said January.

*People v. Martinez*, Nos. C056029, C058137, 2009 WL 2871587, at *1-4 (Cal. Ct. App. Sept. 8, 2009).

Martinez and Johnson proceeded to jury trial on December 14, 2006.  On January 29, 2007, the jury found Martinez guilty of first degree murder and also found true the firearm use and arming enhancements.  The jury also found Johnson guilty of first degree murder and the arming enhancement true.  After Martinez waived his right to a jury trial on his prior-conviction allegation, the court found that he previously had been convicted of one serious felony.  The trial court then sentenced Martinez to an aggregate imprisonment term of 54 years to life.[3]

Through counsel, Martinez appealed his conviction, arguing that: 1) the trial court abused its discretion in refusing to order disclosure of Helana's address or her sealed testimony from an *in camera* proceeding; 2) the trial court further erred in refusing to review the sealed transcripts in response to that discovery request; 3) Martinez's confrontation rights were violated by the court's exclusion of specific impeachment evidence and trial counsel was ineffective for failing to obtain a final ruling or make a specific offer of proof as to the proffered cross-examination of Helana; 4) the trial court abused its discretion by inviting counsel to make short opening statements during voir dire; 5) his co-defendant's counsel deprived Martinez of his Sixth Amendment rights to confrontation and cross-examination through his improper opening statement during voir dire; 6) the trial court erred in refusing to allow Martinez to question

---

[3]       Johnson was later sentenced to state prison for 26 years to life.

prosecution witness Christina Goodwin about her belief that Johnson had molested her daughter; 7) the trial court abused its discretion in denying Martinez's motion for a mistrial; 8) the existence of cumulative error warranted reversal of his conviction; 9) the jury instruction contained in CALCRIM No. 220 inaccurately defined reasonable doubt; 10) the evidence was legally insufficient to support the submission of the case to the jury on a theory of felony murder; and 11) there was insufficient evidence that Martinez's prior assault conviction qualified as a strike.

The Court of Appeal modified the judgment against both Johnson and Martinez to expressly provide that they were jointly and severally liable for the direct victim restitution, as Johnson had requested on appeal. *Martinez*, 2009 WL 2871587, at *30. The appellate court unanimously affirmed Martinez's judgment as modified in a reasoned, unpublished opinion issued on September 8, 2009. *Id.* Counsel for Martinez subsequently petitioned the Court of Appeal for rehearing, arguing that the appellate court's rejection of his confrontation claim regarding the proposed cross-examination of Helana was based on a legal and factual error and the court should reconsider the "impossible objection requirement" it demanded to preserve his claim that co-counsel's opening statement during voir dire violated Martinez's constitutional rights. The Court of Appeal summarily denied the petition on September 25, 2009.

Again proceeding through counsel, Martinez then petitioned for review in the California Supreme Court, raising his arguments that: 1) the withholding of Helana's address and her sealed testimony violated his due process rights; 2) Martinez was denied a fair trial due to the trial court's rulings with regard to the cross-examination of Helana; 3) the Supreme Court should "assess the limits and conditions" for allowing counsel to make opening statements during jury

selection; 4) the opening statement made by co-defendant's counsel violated Martinez's constitutional rights; 5) Martinez's confrontation rights were violated when he was not allowed to question prosecution witness Christina Goodwin about her belief that Johnson had molested her daughter; and 6) there was insufficient evidence to instruct the jury on first degree felony murder. The Supreme Court denied the petition without comment on December 17, 2009. Martinez additionally sought a writ of certiorari from the United States Supreme Court, which was denied on April 5, 2010.

Martinez then filed in the Shasta County Superior Court a *pro se* petition for a writ of habeas corpus, alleging that: 1) counsel was ineffective for failing to investigate alibi witnesses; 2) the prosecutor committed misconduct by manipulating and coercing Helana's testimony; 3) the State destroyed or lost material evidence that had exculpatory value; and 4) trial counsel had a conflict of interest that deprived Martinez of due process and his right to the effective assistance of counsel. In support of his claim that trial counsel failed to investigate potential alibi witnesses, Martinez attached declarations from 4 witnesses, including Helana, who declared that she was in a fragile mental state and was susceptible to "memory manipulation" during the time she reported Martinez's confession to detectives and when she testified at trial, and Eric Voet, who stated that he knew "for a fact" that Martinez was at home when Kohn's murder occurred. The superior court appointed counsel for Martinez and ordered an evidentiary hearing on his claims that trial counsel had a conflict of interest and was ineffective for failing to investigate alibi witnesses. The court rejected the remainder of Martinez's claims in a reasoned, unpublished decision.

While that petition was pending, Martinez filed a second *pro se* habeas petition in the state superior court on December 11, 2010.  In that petition, Martinez claimed that he was denied his right to access the courts due to the inadequate law library and legal assistance provided to prisoners of the Shasta County Jail.  On December 29, 2010, the superior court denied his second habeas petition for failure to state a prima facie case in a reasoned, unpublished opinion.

The superior court then held an evidentiary hearing on his first habeas petition.  Both Martinez's trial attorney and trial investigator testified that Martinez had not given them the name of Eric Voet and neither had heard of that name until the habeas petition was filed.  The investigator testified that he spent almost 500 hours investigating the case and searching for possible alibi witnesses but never came across Voet's name.  Voet testified that, after he learned about Martinez's incarceration in April 2010, he was certain that Martinez was with him at Martinez's home the night of the murder.

Martinez also argued at the hearing that trial counsel had a conflict of interest because he had previously represented Delwood Wilson, the victim of Martinez's earlier offense that was alleged to be a prior strike conviction.  Wilson was a potential impeachment witness who may have been called by the prosecution if Martinez testified at trial.  Trial counsel testified that he advised Martinez not to testify based on the merits of the case and not to avoid a conflict in the event Martinez testified.  Martinez alleged that counsel's failure to investigate and locate alibi witnesses demonstrated that Martinez was prejudiced by counsel's conflict of interest.  At the conclusion of the hearing, the superior court rejected both claims.

The court subsequently issued a written opinion denying those claims, stating in relevant part:

First, as to the claim of ineffective assistance o[f] counsel based on the failure to investigate, locate, and produce for trial alibi witness Eric Voet, the court found Eric Voet was not credible in his testimony in which he purported to provide [Martinez] with an alibi at the time of the killing.  Moreover, despite [Martinez's] testimony to the contrary, based on the credible testimony of trial counsel Aaron Williams and defense investigator Doug Manning the court concluded that [Martinez] never mentioned Eric Voet as a potential alibi witness to his attorney or investigator prior to trial.  Thus, counsel had not been ineffective in that regard.

Second, on the issue of attorney conflict due to trial counsel's prior representation of Delwood Wilson, the named victim in [Martinez's] prior strike case, the court concluded that representation of Wilson and [Martinez] represented only a possible conflict of interest, not an actual conflict, and that nothing trial counsel did or failed to do in defending [Martinez] was influenced by his prior representation of Delwood Wilson.

The trial court nonetheless granted Martinez's motion to relieve Williams as counsel and appointed new counsel for the purpose of representing Martinez on his motion for DNA testing.

Martinez then filed in the California Court of Appeal a *pro se* petition for a writ of habeas corpus dated March 22, 2011.  In that petition, Martinez raised to the Court of Appeal his claims that counsel was ineffective for failing to investigate alibi witnesses, the prosecution committed misconduct by coercing and coaching Helana's testimony, the State destroyed exculpatory evidence, and counsel had a conflict of interest.  Martinez additionally raised a "newly discovered evidence" claim based on a sworn and notarized affidavit from Helana, who recanted her testimony that she believed Martinez was involved in the murder.  She alleged that her victim's advocate, the girlfriend of Martinez's divorce attorney, manipulated Helana's fragile mental state "to destroy [Martinez] and get [their] house at a cheap divorce price" and that the police and prosecution further manipulated her.  Martinez also raised a judicial bias claim, alleging that the superior court judge abused his discretion in certain rulings he made during the evidentiary hearing and was biased against Martinez because of his former career as a prosecutor and his continuing friendship with the District Attorney.  The Court of Appeal summarily denied

the petition on April 7, 2011.  Martinez then raised the same claims in a *pro se* habeas petition to the California Supreme Court.  That court denied the petition without comment on November 16, 2011.

Martinez then filed in the superior court a third *pro se* petition for a writ of habeas corpus, which challenged the court's restitution order and alleged ineffective assistance of counsel due to trial counsel's failure to object to the order.  On April 20, 2012, the superior denied the petition in a reasoned, unpublished opinion rejecting the claims as procedurally barred because they were not raised on direct appeal and as without merit.  Martinez also raised those claims in a second *pro se* petition to the Court of Appeal, which was summarily denied with a citation to *People v. Romero*, 51 Cal. Rptr. 2d 26 (Cal. Ct. App. 1996) (holding that a trial court imposing a restitution fine is not required to make an express finding of the defendant's ability to pay the fine).  Martinez then raised those claims in another *pro se* petition filed in the Supreme Court, which the court denied without comment on November 20, 2012.

Martinez filed a timely *pro se* Petition for a Writ of Habeas Corpus to this Court on September 4, 2012.  He concurrently filed a motion for a stay and abeyance due to then-pending state court litigation on his motion for DNA testing.  Docket No. 4.  On September 9, 2013, the court denied his motion for a stay.  Docket No. 29.  Martinez subsequently filed an Amended Petition for a Writ of Habeas Corpus on October 10, 2013.

## II. GROUNDS/CLAIMS

In his *pro se* Petition, Martinez raises 11 grounds for relief: 1) counsel was ineffective for failing to investigate alibi witnesses; 2) the prosecutor committed misconduct by manipulating and coercing Helana's testimony; 3) trial counsel had a conflict of interest that deprived Martinez of due process and his right to the effective assistance of counsel; 4) he is actually innocent of the crime; 5) the superior court judge was biased against Martinez and abused his discretion; 6) the trial court's refusal to order disclosure of Helana's address or her sealed testimony from an *in camera* proceeding violated his due process rights; 7) Martinez's confrontation rights were violated by the court's rulings regarding the proffered cross-examination of Helana; 8) his co-defendant's counsel deprived Martinez of his Sixth Amendment rights to confrontation and cross-examination through his improper opening statement during voir dire; 9) the trial court erred in refusing to allow Martinez to question Goodwin about her belief that Johnson had molested her daughter; 10) the evidence was legally insufficient to support the submission of the case to the jury on a theory of felony murder; and 11) the trial court improperly imposed restitution without determining Martinez's ability to pay.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that

contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004)

(citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

<u>Claims 1-3.</u>    <u>Ineffective Assistance of Counsel</u>

Martinez first alleges that counsel was ineffective for failing to investigate "viable alibi witnesses" and for representing him despite a conflict of interest.  To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.  Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* standard.  *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).  Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

14

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold."  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Martinez must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.  *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985).  An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs.  *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).  It is through this highly deferential lens that a federal habeas court reviews *Strickland* claims under the § 2254(d) standard.  *See Knowles*, 556 U.S. at 123 (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

A.    *Failure to Investigate Alibi Witnesses (Claim 1)*

Martinez first faults counsel for failing to investigate alibi witnesses, specifically Eric Voet.  Martinez first raised this claim in a habeas petition in the state superior court, which he supported with declarations obtained in 2010 from Voet and Helana.

Voet declared in his April 15, 2010, declaration that, in January 1997, he had been living in an apartment with Martinez, Helana, and Helana's brother.  On the evening of the murder, Voet was drinking with Martinez and other friends at the apartment.  According to Voet, Martinez went to bed around 2:30 a.m. or 3:00 a.m.  He further averred that he knew "for a fact

that no one left the apartment [the morning of January 30, 1997,] from 3:00-6:00 a.m." because the couch where he slept that night was located next to the apartment door.  Voet did not see Martinez come downstairs from the bedroom until "later that morning around 6:00 a.m. or so." Voet remembered the incident because he and Helana's brother had planned to drive to Los Angeles the morning of January 30, 1997, and Martinez had given the brother $100 for gas money.  Later that day, Voet heard about the murder on the radio.  Helana's declaration, dated June 1, 2010, described her fragile mental state at the time she reported Martinez's confession to the detectives and when she testified at trial.  She also declared that she was susceptible to "memory manipulation" and suggestion.

The superior court ordered an evidentiary hearing on the claim.  At the hearing, Voet testified consistently with his declaration and informed the court that, although he could have been tracked down through his parents and was listed in the phonebook, he had not been interviewed at the time of trial.  He further testified that he submitted the declaration after he saw Helana, and she informed him that Martinez was in jail and that trial counsel could not locate Voet at the time of his trial.  He thought about the date of the murder and remembered that Martinez had been at home that night.  Helana also testified that neither Martinez's trial counsel nor his investigator interviewed her before trial and described her mental health issues.  When asked about Martinez's confession, Helana testified, "I've always said that he's told me.  He told me about it, but my belief has changed."

Martinez also testified at the hearing and stated that he told trial counsel that Helana, Voet, and Helana's brother were potential alibi witnesses because he had been living with them at the time of the murder and should be contacted to see if they remembered anything.  He

further stated that he repeatedly asked counsel whether there was any progress in finding those witnesses, but the response was always no. There was "no question" in Martinez's mind that he had provided those names to his attorney, and he also provided the alibi information to the trial investigator, who also reported that he had no progress in locating the witnesses.

Martinez's trial investigator testified for the People and stated that Martinez had never given him the names of Voet or Helana's brother and had not instructed him to investigate Helana as a potential alibi witness. He claimed that Martinez had been unable to give him any alibi information, and he was unable to find any. He further testified that he had made several attempts to interview Helana but that she was working with a victim-witness advocate and refused to speak with them without a representative from the District Attorney's Office or her advocate present. The trial team was concerned that their case would be compromised if they interviewed her in the presence of an employee of the District Attorney's Office.

Martinez's trial attorney likewise testified for the People and stated that he had a "pretty strong belief" that they "looked hard for alibi witnesses" but were unable to find any due to the age of the case. Counsel could not recall if Martinez had told him about Voet, but he would have remembered if Martinez gave him the name of someone who could provide an alibi. He had no recollection of Martinez repeatedly asking him if he had made progress on finding an alibi witness. Given that seven years had passed since the night of the murder when the trial investigation began, trial counsel did not believe he would have asked the investigator to canvas the neighborhood to see if anyone knew where Martinez had been that night. Counsel further stated that he did not interview Helana because she would only agree to be interviewed in the presence of a representative from the District Attorney's Office, which was "unacceptable."

17

Following the hearing, the Superior Court rejected the claim on the following grounds:

> First, as to the claim of ineffective assistance o[f] counsel based on the failure to investigate, locate, and produce for trial alibi witness Eric Voet, the court found Eric Voet was not credible in his testimony in which he purported to provide petitioner with an alibi at the time of the killing.  Moreover, despite petitioner's testimony to the contrary, based on the credible testimony of trial counsel Aaron Williams and defense investigator Doug Manning the court concluded that petitioner never mentioned Eric Voet as a potential alibi witness to his attorney or investigator prior to trial.

In the instant Petition, Martinez challenges the superior court's conclusion by requesting the Court to redetermine the credibility of these witnesses.  However, this Court must defer to the state court's finding regarding who was the more credible witness because "no sort of factual finding[] is more appropriate for deferential treatment than . . . a state court's credibility determination."  *Knaubert v. Goldsmith*, 791 F.2d 722, 727 (9th Cir. 1986).  "'Title 28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.'"  *Id.* (quoting *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)).  The Supreme Court has stated, "When a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error."  *Anderson v. City of Bessemer, N.C.*, 470 U.S. 564, 575 (1985).

Moreover, the additional evidence that Martinez presented to the California Supreme Court does not undermine the superior court's credibility findings or ultimate rejection of his ineffective assistance claim.  Martinez provided the declarations of his aunt, uncle, and grandmother to that court, but they simply state that no one interviewed them at the time of Martinez's trial.  The declarations do not indicate that they could provide an alibi for him, and

thus Martinez cannot show that he was prejudiced by counsel's failure to interview those individuals.  Likewise, the additions to the declarations of Helana and her mother merely state that they recall Helana's brother taking a trip with Voet around the time of the murder.  Such statement is insufficient to show that the superior court clearly erred in its credibility determinations.

Martinez also presented in his habeas petition to the state supreme court a statement from Taskeen L. Tyler, who stated that, if defense counsel had interviewed him, Tyler would have told him that co-defendant Johnson "told [Tyler] in several conversations about his case that Mr. Martinez was not ever with him the night of the murder and in any case Mr. Martinez was never with him at night after December of 1996."  According to Tyler, Johnson did not admit the murder, but he stated "it was impossible for this to go the way it is being pictured and portrayed the way [Helana] and the prosecution were saying."  But counsel could not be deemed ineffective for failing to obtain this information from Tyler because Tyler admits in his declaration that he did not recognize Johnson at the time of the trial.  Rather, it was only "later" when he "had time to think about the situation" that he remembered Johnson's statements.  *See United States v. Harden*, 846 F.2d 1229, 1231-32 (9th Cir. 1988) (no ineffective assistance because of counsel's failure to call a witness where, among other things, there was no evidence in the record that the witness would have testified at time of trial); *see also Dows v. Wood*, 211 F.3d 480, 486-87 (9th Cir. 2000) (rejecting for lack of evidence ineffective assistance claim alleging failure to call a witness).  Moreover, given that the statement contains inadmissible hearsay, is unsworn, and not authenticated, verified, or otherwise acknowledged by a third party such as a notary public, the state court may have reasonably found the statement of insufficient

evidentiary value to demonstrate that counsel was ineffective.  Accordingly, Martinez fails to

demonstrate that the state courts' rejection of this ineffective assistance claim is either

unreasonable or contrary to federal law, and he is not entitled to relief on this ground.

> B.    *Conflict of Interest (Claim 3)*

Martinez additionally alleges that he received constitutionally ineffective assistance at

trial because his attorney had a conflict of interest based on his prior representation of Delwood

Wilson, the victim of Martinez's prior strike conviction.  Martinez also raised this claim in his

first habeas petition to the superior court, and the claim was addressed in the subsequent

evidentiary hearing.

At the hearing, trial counsel testified that he had been appointed to represent Wilson prior

to representing Martinez.  He had known that Wilson was the victim of the prior conviction and

thought he might have a conflict of interest based on his earlier representation.  He informed

Martinez "early on" that he had previously represented Wilson but told him that he did not

believe his prior representation of Wilson was a conflict because "strikes are only allowed to be

proved by paperwork" and "did not foresee" cross-examining Wilson.  He also testified that the

potential conflict was disclosed on the record in Martinez's presence during a closed proceeding

that occurred "much later."  He further testified that his prior representation of Wilson did not

affect any of the advice he gave to Martinez or any trial tactics.  His tactical advice not to testify

was not based on his prior representation of Wilson.  On cross-examination, trial counsel

acknowledged that, if Martinez had testified at trial, Wilson could have been called as a witness

bearing on Martinez's truthfulness.  Counsel testified that he had not considered that possibility

at the time of trial, and he did not advise Martinez that, if he chose to testify, Wilson could be

called to impeach him.  Counsel stated that he never anticipated that Wilson would testify as strikes are not proven through victim testimony, and he did not recall ever seeing Wilson's name appear on a witness list for trial.  Following additional briefing, the court rejected Martinez's claim that trial counsel suffered from a conflict of interest while representing Martinez.

The Sixth Amendment right to the effective assistance of counsel includes a correlative right to representation free of conflicts of interest.  *See Wood v. Georgia*, 450 U.S. 261, 271(1981).  To establish a violation of the Sixth Amendment right to conflict-free counsel, a petitioner must show that "an actual conflict of interest adversely affected his lawyer's performance."  *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980).  For Sixth Amendment purposes, an "actual conflict" is a conflict of interest that "adversely affects counsel's performance."  *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002).  "[A] mere theoretical division of loyalties" is not enough.  *Id.* at 171.  The Ninth Circuit has stated that, to demonstrate an actual conflict resulting in an adverse effect, the petitioner must demonstrate "that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."  *Hovey v. Ayers*, 458 F.3d 892, 908 (9th Cir. 2006) (quoting *United States v. Wells*, 394 F.3d 725, 733 (9th Cir. 2005)).

As an initial matter, while it may be argued that Martinez accepted the risk of conflict, the record is unclear as to whether and when Martinez was informed of the potential conflict.  It is further unclear whether he expressly waived it.

In any event, Martinez's claim must be rejected on its merits.  As the state court reasonably concluded, trial counsel's "representation of Wilson and petitioner presented only a

possible conflict of interest, not an actual conflict."  An actual conflict may exist in a case of successive representation if the two cases are substantially related or if the attorney may be required to reveal any privileged communication or otherwise divide his loyalty.  *Maiden v. Bunnell*, 35 F.3d 477, 480 (9th Cir. 1994); *Mannhalt v. Reed*, 847 F.2d 576, 583 (9th Cir. 1988). Martinez fails to show that trial counsel was forced to divide his loyalty here, and, as the superior court further found, "nothing trial counsel did or failed to do in defending petitioner was influenced by his prior representation of Delwood Wilson."  Again, this Court cannot find that the superior court clearly erred in finding trial counsel's testimony credible, and thus Martinez cannot show that the state court's rejection of this claim was unreasonable.  Martinez therefore is not entitled to relief on this ineffective assistance claim either.

Claim 2.       Prosecutorial Misconduct

Martinez next claims that the prosecution "commit[t]ed various forms of misconduct in the petitioner's case from witness manipulation, falsifying documents, and destroying/losing evidence that produced a trial so infused with unfairness it made the resulting conviction a total miscarriage of justice."  Federal habeas review of prosecutorial misconduct claims is limited to the narrow issue of whether the alleged misconduct violated due process.  *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  To prevail on such a claim, a petitioner must show that the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  Moreover, "[o]n habeas review, constitutional errors of the 'trial type,' including prosecutorial misconduct, warrant relief only if they 'had substantial and injurious effect or influence in determining the

22

jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

In support of this ground, Martinez first contends that the prosecution manipulated Helana, exploited her mental health issues, and falsified documents to coerce favorable testimony.  Martinez raised this claim in state habeas petitions before the Superior Court, the Court of Appeals, and the Supreme Court.  The Court of Appeals and the Supreme Court both summarily denied the claim and therefore the last reasoned state court decision is that of the Shasta County Superior Court, which considered and rejected this claim as follows:

> The allegation of prosecutorial misconduct is supported by the declaration of Helena Martinez.  The petitioner contends that the prosecutor told Ms. Martinez ". . . to say and not to say certain things during [her] testimony in front of the judge in the pre-trial hearing and in front of the jury during trial."  However, Ms. Martinez does not specify exactly what she was told, nor does she state that she testified falsely as a result of the prosecutor's urgings.  Ms. Martinez states that she cannot remember a lot of her testimony, but purports to remember exact instructions from the prosecutor as to what points her testimony should hit.  Petitioner again, has not met his burden and has not provided sufficient evidence to support his allegations.  Thus, as to his claim of prosecutorial misconduct, his writ of habeas corpus is also denied.

To the extent that Martinez avers that habeas relief is warranted due to the allegedly-unlawful coaching of Helana by a law enforcement officer and prosecutor, such claim is not cognizable on federal habeas review.  This Court is unaware of, and Martinez does not cite, any United States Supreme Court authority indicating that an "unlawful coaching" claim such as this rises to the level of a federal constitutional violation.  In the absence of any clearly established federal law on this issue, AEDPA relief is foreclosed.  *See Carey*, 549 U.S. at 77; *see also United States v. Sayakhom*, 186 F.3d 928, 945 (9th Cir. 1999) ( "Cross-examination and argument are the primary tools for addressing improper witness coaching.").

However, "the [Supreme] Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnotes omitted).  The essential elements of such successful claim are that (1) the testimony is false or perjured, (2) the prosecutor knew that the testimony was false or perjured, and (3) the false testimony was material.  *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc); *see Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Murtishaw v. Woodford*, 255 F.3d 926, 959 (9th Cir. 2001).  Thus, if Martinez successfully shows that the prosecutor knowingly elicited perjured testimony material to his case, habeas relief may be warranted.

Although the prosecutor has a duty to refrain from knowingly presenting perjured testimony, *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002), the record does not support Martinez's contention that the prosecution knowingly introduced the perjured testimony of Helana or persuaded her to change her testimony to suit the prosecution.  The record supports the superior court's ruling that Helana did not state at any time that she testified falsely and, indeed as discussed with regard to Martinez's actual innocence claim, *infra*, demonstrates that Helana reiterated at the evidentiary hearing that her testimony at trial was truthful.  The state court's rejection of this claim therefore neither contravenes or unreasonably applies federal law, and Martinez is not entitled to relief on it.

Martinez additionally contends that the prosecutor committed misconduct by destroying exculpatory evidence.  Because the Court of Appeal and Supreme Court likewise denied this claim without comment, the Superior Court's rejection of this claim is the last reasoned decision.

As an initial matter, Respondent contends that this prosecutorial misconduct claim is procedurally defaulted here because the state superior court held, with a citation to *In re Lindley*, 177 P.2d 918 (Cal. 1947), that "[h]abeas corpus is not available to review claims concerning trial court rulings or procedural errors, which should have been presented on direct appeal." As a general rule, a federal court will not review a claim if the state court's rejection of the claim rests on a state law ground that is independent of the federal question and adequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). The Ninth Circuit has held that *Lindley* is an independent and adequate state procedural bar that supports default, but that is only with respect to another rule in *Lindley* that mandates that habeas corpus is not a proper vehicle for challenging the sufficiency of the evidence. *See Carter v. Giurbino*, 385 F.3d 1194, 1198 (9th Cir. 2004).

Respondent argues that a procedural bar nonetheless exists here based on his contention that "[t]he superior court's citation to *Lindley* [in this case] stands for the same proposition as a citation to *Dixon*." Docket No. 55 at 108. A citation to *Dixon* indicates that the state court found claims to be barred because they could have been but were not raised on direct appeal. *See In re Dixon*, 264 P.2d 513, 514 (Cal. 1953) ("The general rule is that habeas corpus cannot serve as a substitute for an appeal, and, in the absence of special circumstances constitu[t]ing an excuse for failure to employ that remedy, the writ will not lie where the claimed error could have been, but were not, raised upon a timely appeal from a judgment of conviction."); *see also In re Seaton*, 95 P.3d 896, 901 n.4 (Cal. 2004) ("What we mean when we invoke the *Dixon* bar is that the claim is *based on the appellate record*, and thus was fully cognizable on appeal insofar as it was preserved at trial.").

25

While the Ninth Circuit has not explicitly found that a *Dixon* default is an independent and adequate state law ground, it has indicated that it is likely to do so with respect to the time period at issue here.  *See Bennett v. Mueller*, 322 F.3d 573, 580-86 (9th Cir. 2003) (suggesting in dicta that *Dixon* rule would constitute an independent and adequate state-law ground when applied after the California Supreme Court's 1998 decision in *In re Robbins*, 959 P.2d 311 (Cal. 1998)); *see also Flores v. Roe*, 228 F. App'x 690, 691 (9th Cir. 2007) (finding claim procedurally barred based on *Dixon*); *cf. Park v. California*, 202 F.3d 1146, 1152-53 (9th Cir. 2000) (holding that *Dixon* bar was not independent state law ground prior to *Robbins*).  Some courts in this district have accordingly concluded that habeas review is foreclosed when the petitioner has failed to place the adequacy of the *Dixon* rule at issue and has not shown cause and prejudice or that a miscarriage of justice would result if the claim were not heard.  *See, e.g.*, *Stribling v. Grounds*, No. 12-cv-3084, 2013 WL 5817668, at *4-5 (E.D. Cal. Oct. 29, 2013); *Cantrell v. Evans*, No. 07-cv-1440, 2010 WL 1170063, at *13-14 (E.D. Cal. Mar. 24, 2010).

It is unnecessary, however, for this Court to decide whether a procedural bar exists here because, even assuming that such bar does not exist, Martinez is not entitled to relief on the merits of his claim.  Due process standards require that criminal defendants be afforded a meaningful opportunity to present a complete defense, including "what might loosely be called the area of constitutionally guaranteed access to evidence."  *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982).  It is a violation of a criminal defendant's right to due process when law enforcement agencies fail to preserve evidence that "possess[es] an exculpatory value that was apparent before the evidence was destroyed and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably attainable means."

26

*California v. Trombetta*, 467 U.S. 479, 489 (1984).  Due process only requires preservation of

"evidence that might be expected to play a significant role in the suspect's defense."  *Id.* at 488.

Furthermore, the destruction of potentially exculpatory evidence does not violate the

Constitution unless the evidence was destroyed in bad faith.  *Arizona v. Youngblood*, 488 U.S.

51, 58 (1988).

As the Superior Court concluded when it alternatively rejected Martinez's claim on its

merits:

> Petitioner claims that being unable to retest certain pieces of evidence destroyed his ability to discover exculpatory evidence.  Petitioner claims that in retesting these items his DNA would not have been found, thus exonerating him.  Petitioner's argument is unconvincing.  Absence of petitioner's DNA on these items would not in and of itself prove his innocence, and, without more, . . . the mere presence of an unidentified third party's DNA on any of these items would not necessarily raise a reasonable doubt of his guilt. . . . [P]etitioner's claim is premised on mere conjecture.
> . . . .
> Petitioner also claims that an interview tape which could have been used by the defense to impeach the prosecution's key witness was also destroyed.  This issue was addressed by the trial court and was not brought up on appeal.  Petitioner sets forth his theory as to how and why the tape would have impeached the witness, but fails to explain why this wasn't proffered at trial.  Once again, Petitioner's theory is entirely speculative and does not present a new or different issue that could not have been raised at trial.  As such, petitioner's claim is without merit.

In his Petition, Martinez disputes the state courts' determination regarding the evidence's

exculpatory value, again arguing that the lost evidence would have shown that his fingerprints

were not on the weapon and would have established that Helana's trial testimony was untruthful.

But as the United States Supreme Court has made clear, "habeas corpus is not to be used as a

second criminal trial, and federal courts are not to run roughshod over the considered findings

and judgments of the state courts that conducted the original trial and heard the initial appeals."

*Williams*, 529 U.S. at 383.  Here, it is evident from the record that the state courts litigated the

*Trombetta* issue and concluded that no constitutional violation had occurred under the appropriate state and federal standards.  Martinez has presented no argument in these proceedings nor pointed to any evidence or circumstance that would justify this Court on habeas review running "roughshod" over the considered findings and rulings of the state courts in this case.

Martinez thus cannot prevail on any argument advanced in support of his prosecutorial misconduct claim.

     <u>Claim 4.</u>     <u>Actual Innocence</u>

     Martinez additionally contends that his conviction must be reversed because he is actually innocent of the crime.

     In his Answer, Respondent argues that Martinez cannot prevail on this claim because it is not cognizable on habeas review.  The Ninth Circuit has not "resolved whether a freestanding actual innocence claim is cognizable in a federal habeas corpus proceeding in the non-capital context." *Jones v. Taylor*, 763 F.3d 1242, 1246 (9th Cir. 2014).  However, in a case issued after Respondent filed his Answer, the Ninth Circuit expressly noted that it "assumed that such a claim is viable." *Id.* (citations omitted).  This Court therefore assumes that a freestanding actual innocence claim is cognizable on federal habeas review.

     Although the Ninth Circuit has not "articulated the precise" standard to establish a "freestanding actual innocence claim," *id.* at 1247, it has called the standard "extraordinarily high," *id.* at 1246 (citations and internal quotation marks omitted).  "[A]t a minimum, the petitioner must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *Id.* (citations and internal quotation marks omitted).  Indeed, both the

Supreme Court and the Ninth Circuit have rejected freestanding actual innocence claims in the face of compelling new evidence where the new evidence did not "'conclusive[ly] exonerat[e]'" the petitioner or "'preclude any possibility of [the petitioner's] guilt.'"  *Id.* at 1247-48 (quoting *House v. Bell*, 547 U.S. 518, 555 (2006) and *Carriger v. Stewart*, 132 F.3d 463, 477 (9th Cir. 1997)).

Martinez claims that newly discovered evidence, namely alibi evidence from Voet, Helana's recantation of her belief about Martinez's guilt, and Tyler's declaration, establishes his actual innocence.[4]  Where a habeas petitioner seeks to rely on new evidence to prove actual innocence, the new evidence "must be reliable." *Id.* at 1247 (citation omitted).  In determining the evidence's reliability, the reviewing court "may consider" the "timing of the submission" and the "likely credibility" of an affiant.  *Id.* (citation and internal quotation marks omitted).  The court must then consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial."  *Id.* (citation and internal quotation marks omitted).  Based on this "total

---

[4]       Martinez also relies on a declaration from Jerome Anderson in support of his actual innocence.  Like Tyler, Anderson states that co-defendant Johnson informed Anderson that Martinez was not at the scene of the crime.  Anderson additionally avers that Johnson admitted to him that Johnson had committed the crime with Harris, not Martinez.  But the record indicates that Martinez included that declaration in the instant Petition only; he did not present that declaration to the California Supreme Court.  Consequently, this Court may not consider that declaration in these proceedings.  *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (reiterating that "review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits"); *Murray v. Schriro*, 745 F.3d 984, 998 (9th Cir. 2014) ("Along with the significant deference AEDPA requires us to afford state courts' decisions, AEDPA also restricts the scope of the evidence that we can rely on in the normal course of discharging our responsibilities under § 2254(d)(1).").  The Ninth Circuit has observed that "*Pinholster* and the statutory text make clar that this evidentiary limitation is applicable to § 2254(d)(2) claims as well."  *Gulbrandson v. Ryan*, 738 F.3d 976, 993 n.6 (2013) (citing § 2254(d)(2) and *Pinholster*, 131 S.Ct. at 1400 n.7).

record," the court must decide whether the petitioner has demonstrated actual innocence.  *Id.*

(citations and internal quotation marks omitted).

With respect to Voet's declaration, the superior court determined after an evidentiary

hearing that Voet was not credible, a finding that, as discussed above, this Court cannot find

clearly erroneous.  Similarly, the superior court also heard testimony from Helana at the

evidentiary hearing and considered her affidavit:

> Petitioner contends that he is actually innocent of the crime for which he was convicted.  As support, he provides a declaration from Helena Martinez.  Ms. Martinez, petitioner's ex-wife, was the key prosecution witness establishing petitioner's guilt.  Ms. Martinez now states in her declaration that she suffers from Post Traumatic Stress Disorder; that both the Shasta County District Attorney's Office and the Shasta County Victim Witness Unit was [sic] aware of this diagnosis, and that both agencies ". . . used [her] damaged state of mind . . ." to ". . . lead [her] to believe that [her] ex-husband was the enemy."  Petitioner states that the district attorney's office and the victim witness advocate "coerced and manipulated" her testimony.  What is notable about her declaration, however, is that while she complains about both the prosecutor and the victim witness advocate, *she never recants any of the testimony she gave at trial.*  She merely states that after having gone over transcripts of the trial, she noted inconsistencies, but those inconsistencies do not go to the heart of her testimony, which was that petitioner confessed to the murder.  With the trial having occurred over three years ago, and given Ms. Martinez' self admitted mental issues and her apparent contact with the petitioner, her declaration is highly suspect.  Even if true, however, her statements do not establish any new facts or law upon which a prima facie case for relief could be granted.

The mere recantation of testimony does not provide grounds for habeas relief.  *Hysler v.*

*Florida*, 315 U.S. 411, 413 (1942); *Carothers v. Rhay*, 594 F.2d 225, 229 (9th Cir. 1979).  "The

essence of the due process violation is misconduct by the government, not merely perjury by a

witness."  *Morales v. Woodford*, 388 F.3d 1159, 1179 (9th Cir. 2004).  This is particularly true

here given that, as the state court noted, Helana "never recants any of the testimony she gave at

trial."  As noted before, Helana and her mother submitted slightly different declarations in the

California Supreme Court which stated that they recalled Voet taking a trip with Helana's

brother around the time of the murder.  But, just as that information was insufficient to establish

that the superior court clearly erred in finding Voet not credible, that information fails to meet

the extraordinarily high threshold of establishing Martinez's actual innocence.

With respect to Tyler's declaration that Johnson informed him that Martinez was not with

him the night of the murder, although evidence need not necessarily be admissible to support an

actual innocence claim, *see Jones*, 763 F.3d at 1247, it is not only the hearsay nature of the

declaration that detracts from the declaration's potential to persuade.

The record indicates that Tyler appeared as a witness at Martinez's and Johnson's trial in

late December 2006.  He testified that it was common knowledge among his friends that Kohn

had large amounts of money.  Harris tried to recruit Tyler to help him rob Kohn and take his

money.  Harris told Tyler that he had burglarized Kohn's apartment (the Super Bowl Sunday

burglary) but had not been able to locate the $10,000 he knew Kohn had.  Harris told Tyler that

he would kill Kohn if he had to in order to get the money.  On the morning of Kohn's homicide,

Harris showed up at Tyler's house "very nervous and agitated" and told Tyler that "somebody

killed the boy."  At trial, Tyler identified Martinez as someone he had "seen . . . a few times."

Tyler did not recognize Johnson.

Tyler's declaration, which is dated March 30, 2011, indicates that he had "several

conversations" with Johnson while they were at Shasta County Jail in 2004, where Johnson told

him that Martinez "was not ever with him the night of the murder and in any case Mr. Martinez

was never with him at night after December of 1996."  He further states, "Mr. Johnson never

admitted guilt of the murder [but] stated it was impossible for this to go the way it is being

pictured and portrayed the way [Helana] and the prosecution were saying."  Setting aside the

inherent reliability issues implicated in a declaration containing hearsay,[5] *see Herrera v. Collins*, 506 U.S. 390, 417 (1993) (finding hearsay affidavits in support of actual innocence claim "particularly suspect"), it is easy to see why the California Supreme Court may have been skeptical of Tyler's statement that he was able to recall conversations he had with Johnson 7 years after they occurred, yet could not recognize Johnson at the time of the trial, which was roughly 3 years after Johnson allegedly made the exculpatory statements.  Indeed, that Johnson had not seen Martinez since December 1996 was contradicted by Helana's trial testimony that she last saw Johnson at Martinez's home in 2002 and had seen him there 4 or 5 times in 1997.  Likewise, Johnson did not admit that he committed the murder, or that he committed the murder with someone else, and thus his hearsay statements do not establish that Martinez was actually innocent.

In sum, considering "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial," *Jones*, 763 F.3d at 1247, this Court concludes that the total record does not satisfy the "extraordinarily high" standard for establishing actual innocence, *id.* at 1246.  The Ninth Circuit's ruling in *Jones v. Taylor* further compels this result.  In that case, the Ninth Circuit reversed the district court's grant of habeas relief to a petitioner which had been based on the recantation of the three trial witnesses, including the victim.  *Id.* at 1251.  In holding that the petitioner failed to establish his actual innocence, the Court stated, "The most that can be said of the new testimony is that it undercuts the evidence presented at trial.  Evidence that merely casts

_____

[5]     This is particularly true here given that, as previously noted, Tyler's declaration is unsworn and not authenticated, verified, or otherwise acknowledged by a third party such as a notary public.

doubt on the petitioner's guilt, but does not affirmatively prove innocence, is insufficient to merit relief on a freestanding claim of actual innocence." *Id.* The same is true here.

Martinez requests an evidentiary hearing, and thus the Court may construe his request as seeking an evidentiary hearing as to the veracity and reliability of Tyler's declaration, an issue which was not expressly ruled upon by the state courts. Where the failure to develop the factual basis for the claim in the state court proceedings is not attributable to the petitioner, to receive an evidentiary hearing, the petitioner must make a colorable claim for relief and meet one of the factors set forth in *Townsend v. Sain*, 372 U.S. 293 (1963). *Insyxiengmay v. Morgan*, 403 F.3d 657, 670-71 (9th Cir. 2005). In *Townsend*, the Supreme Court concluded that a federal habeas petitioner is entitled to an evidentiary hearing on his factual allegations if: (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing. *Id.* at 670 (quoting *Townsend*, 372 U.S. at 313), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).

But evidentiary hearings pursuant to 28 U.S.C. § 2254(e)(2) are not authorized for claims adjudicated on the merits in state court. *See Cullen*, 131 S. Ct. at 1400-01; *Detrich v. Ryan*, 740 F.3d 1237, 1246-47 (9th Cir. 2013) (en banc) (plurality) (clarifying that evidentiary development and hearings are only available for claims not adjudicated on the merits in state court, at least so far as the state court's factual determinations upon which the adjudication was based are not

unreasonable).  This Court must presume that the silent denial by the state supreme court was an adjudication on the merits of the federal constitutional claim presented and that court deemed Tyler's declaration insufficient to establish Martinez's actual innocence on federal constitutional grounds.  *See Harrington v. Richter*, 131 S. Ct. 770, 784-86 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."); *Ylst v. Nunnemaker*, 501 U.S. 797, 803-06 (1991).  This Court "must determine what arguments or theories . . . could have supported the state court's decision and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court.  *Harrington*, 131 S. Ct. at 786.  As explained above, the California Supreme Court's implicit rejection of the Tyler declaration in its silent denial of Martinez's actual innocence claim was not unreasonable.  Accordingly, Martinez is not entitled to an evidentiary hearing on this claim either.

    Claim 5.        <u>Judicial Bias</u>

       Martinez additionally asserts that the judge who presided at his trial and habeas proceedings in the superior court was biased against him.  The record indicates that Martinez first raised the issue of judicial bias when he moved to challenge the judge's assignment to the state habeas proceedings on the ground that it would be improper for him to review his own trial rulings.  The judge denied the motion, explaining that he would not be reviewing any of his trial rulings as the habeas petition in the superior court alleged that trial counsel was ineffective for failing to investigate alibi witnesses and had a conflict of interest, which were issues that had not

come up at trial.  After his habeas petition in the superior court was denied, Martinez

additionally alleged in habeas petitions to the state appellate and supreme courts that the judge

was biased against him during his trial and the habeas proceedings in superior court.

The Due Process Clause guarantees a criminal defendant the right to a fair and impartial

judge.  *See In re Murchison*, 349 U.S. 133, 136 (1955).  Indeed, the Supreme Court has

recognized that "the right to an impartial judge [is] among those 'constitutional rights so basic to

a fair trial that their infraction can never be treated as harmless error.'"  *Greenway v. Schriro*,

653 F.3d 790, 805 (9th Cir. 2011) (quoting *Chapman v. California*, 386 U.S. 18, 23 (1967)).  But

a petitioner claiming judicial bias must overcome a "presumption of honesty and integrity" on

the part of the judge.  *See Withrow v. Larkin*, 421 U.S. 35, 47 (1975).  Moreover, a claim of

judicial bias based on improper conduct by a state judge in the context of federal habeas review

does not simply require that the federal court determine whether the state judge's conduct was

improper; rather, the question is whether the state judge's conduct "rendered the trial so

fundamentally unfair as to violate federal due process under the United States Constitution."

*Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995) (citations omitted).

In support of his contention that the trial judge was biased, Martinez notes that the trial

judge denied most of his post-conviction motions as well as his habeas petition.  He further

states, "Bias manifested over the course of trial and the allowance of Helana Martinez's

testimony, failure to sep[a]rate trials, and after trial by then not finding [his] ex wife

credible . . . ."  But as the Ninth Circuit has repeatedly recognized, adverse rulings alone are

insufficient to demonstrate judicial bias.  *See Larson v. Palmateer*, 515 F.3d 1057, 1067 (9th Cir.

2008); *Taylor v. Regents of the Univ. of Cal.*, 993 F.2d 710, 712-13 (9th Cir. 1993); *Davis v.*

*Fendler*, 650 F.2d 1154, 1163 (9th Cir. 1981).  This is true even where the rulings are erroneous.  *Hasbrouck v. Texaco*, 842 F.2d 1034, 1046 (9th Cir. 1987); *United States v. Nelson*, 718 F.2d 315, 321 (9th Cir. 1983).  Thus, Martinez's claim that the trial judge was biased as evidenced by his adverse rulings fails to set forth a violation of the due process clause.  *Liteky v. United States*, 510 U.S. 540, 556 (1994) ("All of these grounds are inadequate under the principles we have described above: They consist of judicial rulings, routine trial administration efforts, and ordinary admonishments (whether or not legally supportable) to counsel and to witnesses.  All occurred in the course of judicial proceedings, and neither (1) relied upon knowledge acquired outside such proceedings nor (2) displayed deep-seated and unequivocal antagonism that would render fair judgment impossible.").

Martinez also contends that the judge was biased because of his friendship with the prosecutor and the district attorney.  The record indicates that the trial judge referenced his personal relationship with the District Attorney's office at two points during trial.  First, he stated for the record, in an "abundance of caution," that he was "virtually certain" that he had no involvement with the case while he working in the District Attorney's Office prior to his appointment to the bench, and he believed that the murder occurred "shortly before" his appointment.  He further stated that he had "no recollection" about being consulted, and the prosecutor stated that he had not seen the judge's name "pop up."  The judge thus stated, "I'm satisfied that I didn't have any involvement in this case before I left that office."  In the second instance, the trial judge stated for the record that, in his assignment as Presiding Judge, he "periodically [has] lunch time contact with Mr. Benito, our District Attorney, to discuss administrative matters that affect the Court's operation."  The judge informed the parties that the

two "never talk about cases," as Mr. Benito "knows that would be inappropriate," and the judge "certainly wouldn't permit it.

Even broadly construing the need to avoid the appearance of impropriety, Martinez fails to present evidence suggesting that "a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *Herrington v. Sonoma Cnty.* 834 F.2d 1488, 1502 (9th Cir. 1987) (citation omitted). As the Ninth Circuit has recognized, the Supreme Court has found the appearance of bias, rather than the demonstration of actual bias, sufficient to require recusal in only a few limited circumstances. *Greenway*, 653 F.3d at 806; *Crater v. Galaza*, 491 F.3d 1119, 1131 (9th Cir. 2007). "First, due process requires recusal of a judge who 'has a direct, personal, substantial pecuniary interest in reaching a conclusion against [one of the litigants].'" *Crater*, 491 F.3d at 1131 (quoting *Tumey v. Ohio*, 273 U.S. 510, 523 (1927)). "Second, due process requires recusal if a judge becomes 'embroiled in a running, bitter controversy' with one of the litigants." *Id.* (quoting *Mayberry v. Pennsylvania*, 400 U.S. 455, 465 (1971)). "Third, due process requires recusal if the judge acts as 'part of the accusatory process.'" *Id.* (quoting *In re Murchison*, 349 U.S. 133, 137 (1955)). More recently, the Court held in a case where one litigant was a large donor to the judge's election campaign that recusal was required when "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Greenway*, 653 F.3d at 806 (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 872 (2009)). In this case, Martinez's "claim does not suggest any possible connection of the trial judge to his case that approaches the prior involvement of the judges in *Tumey, Murchison, Mayberry ,* or *Caperton*." *Greenway*, 653 F.3d at 807 (rejecting judicial bias claim where judge had worked with victims'

family member for a few months 18 years before the trial).

Because Martinez's contention that the trial judge's relationship with the District Attorney's Office biased him against Martinez is based on pure speculation and he fails to demonstrate either actual bias or even an appearance of impropriety, Martinez is not entitled to habeas relief on this claim.

<u>Claims 6-9.</u>    <u>Confrontation Violations</u>

Martinez further alleges that his rights to present a defense and confront the witnesses against him were violated when the trial court refused to compel disclosure of Helana's address or sealed testimony regarding her address, restricted his cross-examination of two prosecution witnesses, and allowed Johnson's counsel to give a mini-opening statement in which he effectively provided testimony not subject to cross-examination.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. CONST. amend. VI.  It is well settled that, under the Sixth Amendment, an accused has the right to present witnesses, testimony and other evidence in his defense.  *See Washington v. Texas*, 388 U.S. 14, 19 (1967).  However, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."  *Taylor v. Illinois*, 484 U.S. 400, 409-10 (1988).  States have considerable latitude under the Constitution to establish rules excluding evidence from criminal trials.  *Holmes v. S. Carolina*, 547 U.S. 319, 324 (2006).  "Thus, a trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury.  The trial judge enjoys broad latitude in this regard, so long as the

38

rulings are not arbitrary or disproportionate." *Menendez v. Terhune*, 422 F.3d 1012, 1033 (9th Cir. 2005) (citations omitted); *see Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (holding due process rights are not violated by exclusion of relevant evidence where probative value is outweighed by danger of prejudice or confusion).

Federal Rule of Evidence 403, the federal counterpart to California Evidence Code section 352, permits the exclusion of evidence if its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules. Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ." *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and Cnty. of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009). California employs a similar rule. *See People v. Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings on the admissibility of evidence.").

The right to cross-examine a witness includes the opportunity to show not only that a witness is biased, but also that the testimony is exaggerated or otherwise unbelievable. *Fowler v. Sacramento County Sheriff's Dept.*, 421 F.3d 1027, 1035 (9th Cir. 2005) (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 51-52 (1987) (plurality opinion)). In *Wood v. Alaska*, 957 F.2d 1544, 1549-50 (9th Cir. 1992), the Ninth Circuit laid out a two-part inquiry to determine whether a petitioner's Sixth Amendment rights are violated by restricted cross-examination. The first inquiry is whether the evidence is relevant. *See id*. at 1550. If the evidence is relevant, the next

inquiry is whether other legitimate interests outweigh the defendant's interest in presenting the

evidence.  *See id.*  Hence, to show a restriction on cross-examination violates the Confrontation

Clause, a defendant must demonstrate "'[a] reasonable jury might have received a significantly

different impression of a [witness's] credibility had counsel been permitted to pursue his

proposed line of cross-examination.'"  *Slovik v. Yates*, 556 F.3d 747, 753 (9th Cir. 2009)

(quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1974)).  A limitation on

cross-examination "does not violate the Confrontation Clause unless it limits relevant testimony

and prejudices the defendant."  *United States v. Bensimon*, 172 F.3d 1121, 1128 (9th Cir. 1999)

(internal citation and quotation marks omitted).

      A.    *Disclosure of Helana's Address and Sealed Testimony (Claim 6)*

Martinez argues that the trial court violated his rights to due process and confrontation by

refusing his pre-trial requests for disclosure of Helana's address and her sealed in camera

testimony relating to the disclosure as well as his request for a redacted version of the sealed

statements.  The Court of Appeal provided the following background on Martinez's discovery

requests:

> Before trial Martinez moved for discovery under section 1054.1, including
> Helena's address.  The People opposed the motion to disclose Helena's address for good
> cause under section 1054.7.[6]  Helena was in the California Witness Protection Program

---

[6]    That section provides in relevant part:

The disclosures required under this chapter shall be made at least 30 days prior to
the trial, unless good cause is shown why a disclosure should be denied, restricted, or
deferred.  If the material and information becomes known to, or comes into the
possession of, a party within 30 days of trial, disclosure shall be made immediately,
unless good cause is shown why a disclosure should be denied, restricted, or deferred.
 "Good cause" is limited to threats or possible danger to the safety of a victim or witness,
possible loss or destruction of evidence, or possible compromise of other investigations

due to Martinez's threats to kill her, which resulted in his conviction for criminal threats under section 422.

This motion was denied without prejudice. The court ordered the People to make Helena available to the defense for an interview.

Martinez made a second discovery motion. The prosecution had made Helena available for an interview, but only with a representative of the district attorney's office, a victim-witness advocate, present. Martinez declined this offer.

On December 27, 2004, the court held an in camera hearing to determine whether there was good cause under section 1054.7 not to disclose Helena's address. At the conclusion of the hearing, the court ordered the transcript of the in camera hearing sealed. The court found good cause to prevent the disclosure of Helena's address and phone number after June 29, 2004, when she was placed in the Witness Protection Program.

Martinez then sought disclosure of Helena's in camera testimony as a statement of a witness under section 1054.1, subdivision (f). The People responded section 1054.7 was an exception to the general discovery rule of section 1054.1 and explicitly required the transcript of the good cause hearing be sealed. The court denied the motion, noting there was no petition to unseal, and section 1054 .7 provided for unsealing only on appeal.

Martinez moved for the trial court to review the sealed transcripts and to provide them to the defense. The People again opposed the motion. The court was unsure whether it had authority to unseal a transcript ordered sealed by another judge, but agreed to review the transcript.

Subsequently, the court indicated it was considering releasing portions of the sealed transcript, but wanted to give the People the opportunity to put objections on the record. The court then met with the prosecutor in camera on May 5, 2005. A second meeting was held May 10, 2005. At the conclusions of these in camera hearings, the court decided not to release anything.

*Martinez*, 2009 WL 2871587, at *14.

The Court of Appeal subsequently found that the trial court did not abuse its discretion

by refusing to compel Helana's address, concluding that good cause existed to deny disclosure:

We find no abuse of discretion as there was a credible allegation of potential injury to Helena. Martinez had threatened to kill Helena; his threats had resulted in a conviction under section 422 and Helena's placement in the Witness Protection Program. Nor does Martinez establish any prejudice from withholding Helena's address. Helena made clear she did not want to speak to the defense. She met with Johnson's defense

---

by law enforcement.

CAL. PENAL CODE § 1054.7.

team with an advocate present, but would not speak to them, as was her right. As the trial court noted, a witness's address also permits an attorney to interview neighbors about the witness's reputation. But Helena was hardly a stranger to Martinez; she had known him since she was 14 and they lived together for many years. Even without her current address, Martinez could have interviewed people about Helena's reputation.

*Id.* at *15 (citations omitted).

The appellate court likewise found that the trial court properly refused to disclose the

transcripts of Helana's in camera testimony on the basis of good cause because:

Martinez knew Helena's identity and thus had the means to fully cross-examine her. Further, Helena testified at the preliminary hearing about Martinez's admission and his gun and was subject to cross-examination by both defense counsel. Martinez cannot claim he did not know the reason for withholding Helena's address. In addition to the prosecutor's representation that she was in witness protection, there was an extensive Evidence Code section 402 hearing on the reason Helena delayed reporting Martinez's statements. At this hearing, Helena testified at length about Martinez's prior acts of violence against her, including raping her, pointing guns at her and threatening to kill her.

*Id.* at *16 (footnote omitted).

The Supreme Court has held that the "witness' name and address open countless avenues

of in-court examination and out-of-court investigation. To forbid this most rudimentary inquiry

at the threshold is effectively to emasculate the right of cross-examination itself." *Smith v.*

*Illinois*, 390 U.S. 129, 131 (1968). In *Smith*, the petitioner was denied the right to ask the

principal prosecution witness either his name or where he lived, although the witness admitted

that the name he had given was false. *Id.* In finding a constitutional violation, the Court

explained that "when the credibility of a witness is in issue, the very starting point in 'exposing

falsehood and bringing out the truth' through cross-examination must necessarily be to ask the

witness who he is and where he lives." *Id.*; *see also Alford v. United States*, 282 U.S. 687,

691-693 (1931).

42

The right to discover the address of a witness is not absolute, however.  As the Ninth

Circuit has explained, *Smith* "does not establish a rigid rule of disclosure, but rather discusses

disclosure against a background of factors weighing conversely, such as personal safety of the

witness."  *United States v. Cosby*, 500 F.2d 405, 407 (9th Cir. 1974).  As previously noted, a trial

judge has wide latitude to impose reasonable limits on cross-examination based on concerns

such as harassment, prejudice, confusion of the issues or the witness's safety.  *Clark v. Ricketts*,

958 F.2d 851, 855 (9th Cir. 1991).

In this case, the California Court of Appeal correctly recognized the importance of the

right to cross-examination and that such a right may be curtailed in certain situations.  It cited

both federal and California precedent in discussing the standard required to justify such a

restriction in cross-examination.  The appellate court's ultimate conclusion that the concerns for

the witness's safety were sufficient to support the trial court's ruling in favor of nondisclosure is

both reasonable and entirely supported by the record.  This is particularly true given that, as the

appellate court noted, Martinez was able to otherwise cross-examine Helana (except to the extent

discussed in the following claim) and had sufficient information to investigate her credibility

even without knowing her address.  Martinez is thus not entitled to relief on this ground.

        B.     *Cross-Examination of Helana (Claim 7)*

Martinez also alleges that he was denied the opportunity to effectively cross-examine

Helana when the trial court prohibited him from eliciting testimony from her about their divorce

and custody battles to demonstrate a motive for her to lie about his confession.  On direct appeal,

the Court of Appeal laid out the following facts underlying this claim:

> [P]rior to trial there was a hearing under Evidence Code section 402 (the 402
> hearing), to determine whether evidence of Martinez's acts of domestic violence against

43

Helena was admissible to show why she delayed in reporting his admission of the killing. Helena testified Martinez was abusive; she recounted a series of violent acts. Martinez punched her many times, including in her stomach when she was pregnant, and put knives to her throat 10 times. He killed her cat and dog. On more than one occasion, he pointed a gun at her and pulled the trigger. He raped her and penetrated her with objects, including nunchuks and a knife. He threatened to kill her and choked her over 10 times. Once when she awoke, Martinez was poised with a pillow and about to put it over her face.

The People argued Helena's fear of Martinez was a factor in her not reporting his statements. The trial court, however, found an insufficient nexus between the acts of violence and the delayed reporting. It found the most compelling evidence of the reason for the delay was that Helena did not think Martinez's confession was true.[FN9] The court indicated it was not disallowing evidence of Martinez's threats relating to his confession.

> FN9. The court later described the issue litigated in the 402 hearing as limited to whether Helena failed to report the confession due to the domestic violence. The court found she did not report it because she did not believe it.

In opening statement Martinez told the jury that in June 2004, when Helena saw the reward poster, Martinez's marriage was over. "Couple of kids, and it had the ugliness that you will see in a divorce. There is [sic] battles over money, there was battles over child custody." Martinez's opening statement concluded, "His ex-wife who dislikes him and they're having an ugly divorce says seven years ago he confessed to me and I just got around to telling you. That's the whole case."

After the first witness testified, Johnson wanted to reopen the 402 hearing on admitting Martinez's prior bad acts because the opening statement suggested the only reason for the divorce was marital and money problems. The court responded, "I thought you were on very dangerous grounds there, Mr. Williams [Martinez's counsel]. I took note of that myself. You put Miss Martinez's state of mind squarely at issue, seems to me by your opening statement. Martinez disagreed and the court replied, "So I will look forward to a very spirited discussion about that in the future."

Just before Helena testified, Johnson raised the issue of the court's ruling that Martinez's bad acts would not come in and Martinez's opening statement indicating Helena had a motive to lie as the result of the divorce. Johnson took the position that if motives were explored, it would open the door to Martinez's prior bad acts. The court stated opening statements did not open doors because they were not evidence. However, the court cautioned Martinez that he was "on notice, if he hadn't been before, I'm sure he understood the risks associated with the cross-examination of Miss Martinez, but he is certainly on notice that he's on thin ice with heavy ice skates, as the old expression goes."

Martinez cross-examined Helena about the timing of the alleged confession and her statements to the police. He then asked about the poster. Helena testified the person (Kohn) on the poster was cute, so it caught her eye. She claimed, however, not to notice

44

the $10,000 reward. She denied not telling anyone about the confession until she saw the poster. She said she told a friend in 2003.

Outside the presence of the jury, Johnson and the People requested that they be allowed to put on evidence of the domestic violence to show why Helena had difficulty remembering things. Martinez complained his cross-examination was severely limited due to fear of opening the door to past acts of violence. He could not ask Helena why she did not report the confession earlier.

The court responded the prosecutor was in the same situation as to Helena's memory; he could not ask why. The court continued, "I, just so the record is clear, when you say you are limited in your cross-examination, it's not because I'm placing that limit on you. You are entitled to ask her within reason any question you think you want to. It is your professional sense of responsibility to your client, and knowing that by doing so, asking questions in certain areas you may well open the door that I think you're finding your cross-examination limited, not because of rulings I made." Martinez agreed, "That's absolutely true."

When the People continued to press the need to explore these issues relating to the domestic violence, the court noted, "Well, we're not done." The court told Johnson to "be guided by these comments. Like I said, I'm not fettering your opportunity to ask her questions, just perhaps deferring that until all these issues are somewhat more resolved."

Martinez continued his cross-examination of Helena. He elicited that Helena married Martinez five months after the confession. Helena testified she never paid attention to the Mountain Gate murder; Martinez told her the police found those who did it. Martinez then questioned Helena about her charge that Martinez's mother had molested her daughter.

The People again claimed Martinez had opened the door to his past acts of violence in his cross-examination of Helena. The court responded, "You may be right." Martinez explained he did "dance around" the issue of why Helena did not report earlier. He raised the issue that she had received over $40,000 in benefits from victim's assistance and he avoided those questions to not open the door to past acts. The court stated they may have "tried to parse this out too narrowly." It was a source of wonder why she married a man five months after he confessed to killing someone. The court indicated there were questions they simply would not get the answers to. The court restated its belief that Helena did not report the confession and married Martinez because she did not believe his confession. The court concluded that if there was a relevant theory to admit the domestic violence evidence, "we need to litigate" it.

After a short break, the court found Martinez had not opened the door to the evidence of domestic violence. That evidence shed no light on whether the confession was true. That Martinez's violence may have contributed to her belief that his confession was true once she saw the poster was just "her gratuitous opinion." The court repeated that opening statements are not evidence and do not open doors. There had been no evidence of the divorce.

Before testimony resumed, the court again indicated if there was a relevant basis to admit the domestic violence evidence, it should be litigated.

45

*Martinez*, 2009 WL 2871587, at \*18-20.

Under the guidelines laid out above, this Court does not find that the trial court's restriction on the proposed cross-examination was either unreasonable or contrary to federal law. First, as the Ninth Circuit has explained, there is no Sixth Amendment violation "so long as the jury has 'sufficient information' upon which to assess the credibility of a witness." *Wood*, 957 F.2d at 1549-50 (citation omitted). As the Court of Appeal found:

> Here some of the evidence Martinez contends was missing from cross-examination was nevertheless before the jury. Helena testified she was no longer married to Martinez when she was interviewed by the detective. On cross-examination by Martinez, Helena testified there was a court order distributing property and part of her property was a picture of Martinez she later gave to the police. From this testimony, the jury would have understood Helena and Martinez were divorced and from the nature of her testimony could easily infer she did not like Martinez. In reaching a verdict, jurors apply common sense and life experiences. Helena's status as Martinez's ex-wife alone provided a basis for finding she was biased against him.

*Martinez*, 2009 WL 2871587, at \*20 (citation omitted).

More importantly, the record plainly demonstrates that the trial court would have allowed introduction of the evidence concerning the couple's divorce and custody battle. While the trial court warned defense counsel of the damaging evidence prosecution could introduce in rebuttal to such cross-examination, Martinez does not cite and the Court cannot locate any "clearly established" U.S. Supreme Court precedent holding this constitutes a cognizable restriction on cross-examination for Confrontation Clause purposes. Indeed, Ninth Circuit and district court authority would suggest that Martinez has not stated a cognizable Confrontation Clause claim. *See Bensimon*, 172 F.3d at 1128; *Hicks v. United States*, No. C05-1629, 2006 WL 3373073, at \*3 (W.D. Wash. Nov. 17, 2006) (rejecting Confrontation Clause claim where trial court did not actually restrict cross-examination and merely warned defense counsel that cross-examination

46

would open the door for prosecution to inquire about privileged information).  As the Court of

Appeal held:

> The matters that were left out of cross-examination and the trial were custody battles and that Helena told the police her children were terrified of Martinez and that she watched news stories about the case with them.  While this evidence may have shown some bias on the part of Helena, it is difficult to see how on balance it would have aided Martinez's defense because Helena's bias against Martinez was largely due to his violence against her, a fact he wanted to keep from the jury.  The value for impeachment of this evidence of custody battles and the children's fear depended on whether or not Helena had a good reason to challenge Martinez on custody and whether her report of the children's fear was accurate.  Specific questioning about custody or the children's fear of Martinez would permit Helena to testify there were good reasons to deny Martinez custody and for the children's fear—he had been extremely abusive to her.  Thus, Martinez's premise that he should have been able to introduce this impeaching evidence without fear that his prior acts of violence would be admitted falters.  Whether the court ruled the domestic violence evidence would come in or merely cautioned that it might, the risk that, in rehabilitating Helena after impeachment, the jury would learn of his extremely violent past was very great.  It was sound trial tactics to avoid that risk. Martinez was not denied his right of confrontation in the cross-examination of Helena.

*Martinez*, 2009 WL 2871587, at *21.

Because Martinez was not precluded from eliciting testimony from which the jury may

infer that Helana was biased against Martinez and was not absolutely restrained from pursuing

the line of questioning he sought, Martinez was not denied his right of confrontation.

Accordingly, the state courts' rejection of this claim neither contravened or unreasonably applied

federal law, and Martinez is not entitled to relief on it.

C.      *Cross-Examination of Goodwin (Claim 9)*

Martinez additionally argues that the trial court erred in refusing to allow him to impeach

Christina Goodwin with evidence that Johnson had molested her daughter.  According to

Martinez, the evidence was probative to show that Goodwin had an animus against Johnson and

could use Martinez to get revenge against him.  When considering this claim on direct appeal,

the Court of Appeal summarized the following facts:

> Once Martinez learned that Goodwin's daughter was the victim of Johnson's child molestation conviction, Martinez wanted to use that information to impeach Goodwin.  The trial court was skeptical this evidence would be useful to Martinez.  The court questioned why Goodwin would make up a story about Martinez.
>
> Martinez raised the issue again before Goodwin was to testify.  The court held a hearing under Evidence Code section 402.  Goodwin testified to her on-and-off relationship with Johnson.  When asked if it was a fair assumption that there was no love lost between her and Johnson due to the molestation, Goodwin responded it was not fair to bring the molestation into the murder case.  When asked if she hated Johnson, Goodwin declared, "I'm a child of God, and I don't believe in hate.  Hurt, I'm devastated by it."  Goodwin claimed her feelings for Johnson had nothing to do with Martinez and she bore Martinez no ill will.  Before any argument, the court ruled there would be no discussion of the child molestation.  Martinez admitted he could not change the court's mind.

*Martinez*, 2009 WL 2871587, at *24.

But again, the Court does not find that the trial court's restriction on the proposed cross-

examination was either unreasonable or contrary to federal law.  As the Court of Appeal held:

> We agree with the trial court that the probative value of Goodwin's animus against Johnson because he molested her daughter is weak and tenuous to show she would lie about Martinez.  As to Johnson, the prejudice was great; he decided to forego his right to testify in order to keep this evidence from the jury.  Further, this inflammatory evidence and Martinez's convoluted theory of its relevance as to him would have been time consuming in an already long trial and would have diverted the jury's attention from the issue at hand—the murder of Kohn.
> . . . .
> [T]he evidence had little probative value as to Martinez and did not materially affect his defense.  The trial court's quick ruling after Goodwin was examined in the 402

hearing, without objection by Martinez, indicates Goodwin was credible in denying any
ill will towards Martinez.

*Martinez*, 2009 WL 2871587, at *25.

The Supreme Court's decision in *Davis v. Alaska*, 415 U.S. 308 (1974), does not compel

a different conclusion.  In *Davis*, the petitioner had been convicted of grand larceny and burglary

following a trial in which the trial judge prevented defense counsel from cross-examining a key

witness concerning his adjudication as a juvenile delinquent relating to a burglary and his

probation status at the time of the events.  *Davis*, 415 U.S. at 309-11.  Defense counsel sought to

introduce the witness's juvenile record on cross-examination not as a general impeachment of

the witness's character but rather to show bias and prejudice against the defendant because the

witness, who was then on probation, might have identified the defendant out of fear or concern

that the police might believe he had committed the crime in issue, thereby jeopardizing his

probation.  *Davis*, 415 U.S. at 311.  Following the affirmance of petitioner's convictions by the

Alaska Supreme Court, the United States Supreme Court reversed and remanded, holding that

the jurors were entitled to have the benefit of the defense theory before them so that they could

make an informed judgment as to the weight to place on the witness's testimony.  *Id.* at 317.  In

particular, the court ruled that counsel should have been permitted to ask the witness not only

"whether he was biased," but also "why [he] might have been biased or otherwise lacked that

degree of impartiality expected of a witness at trial."  *Id*. at 318.  The *Davis* Court emphasized

that "the exposure of a witness' motivation in testifying is a proper and important function of the

constitutionally protected right of cross-examination."  *Id.* at 316-17.

The proffered evidence here, however, does not share the probative value of the evidence

at issue in *Davis*.  Martinez's contention that the molestation of her daughter by Johnson led

49

Goodwin to frame Martinez to exact revenge against Johnson is pure speculation.  Moreover, as

the state appellate court noted, the proffered evidence—unlike the evidence at issue in

*Davis*—presented a great risk of prejudice to Johnson.  Therefore the proper question in this case

is whether it was "objectively unreasonable" for the California Court of Appeal to conclude that

the trial court struck a proper balance between preventing the risk of prejudice to Johnson and

protecting Martinez's Sixth Amendment right to examine the witness's motivation for her

testimony.  This Court cannot say that the decision was "objectively unreasonable" given the

weakness of the potential motive that Martinez proffers.  Accordingly, Martinez is not entitled to

relief on this claim.

> D.   *Co-Counsel's Mini-Opening (Claim 8)*

Martinez further contends that his rights to due process and confrontation were violated

when the trial court allowed counsel to make short, 90-second "mini-opening statements" at the

beginning of jury selection.  On direct appeal, the Court of Appeal recounted the following facts

underlying this claim:

> Before jury selection began, the court announced it would like each counsel to
> make a brief opening statement of 90 seconds or less.  The court believed that procedure
> "demystifies some of the process" and is better than simply reading the charges because
> it fills in some background.  Martinez objected, arguing they were all advocates "and this
> runs the very real danger of there being argument or pre-conditioning a jury before we
> even pick them."  He wanted an agreed-upon statement read to the jury.
> The court understood Martinez's argument, but disagreed with it.  It found the
> risk of pre-conditioning very low because as soon as the jury was selected, counsel would
> make extensive opening statements.  The court agreed to consider a mutual statement.
> Johnson joined Martinez's objection.  He pointed out that with several jury
> panels, the short opening statements would vary to some extent.
> After reviewing the People's statement and attempting to draft his own, Martinez
> became more opposed to the idea.  The court said it would give counsel the opportunity
> to make a short statement to the panel of jurors.  It believed the matter was within its
> discretion and it found little prejudice to anyone.

Only the People and Johnson made the "mini-opening statements" and only Johnson's are at issue.  There were four such statements; they were all short and claimed the evidence would show Martinez committed the murder and Johnson was not in the residence at the time of the murder.  Johnson's statements are as follows.

> "The evidence also will be presented that Mr. Martinez beat the victim in this case to death with a gun.  The evidence also will show that the People allege Mr. Johnson's palm print was located inside the residence.  The evidence will also show that Mr. Johnson was not present in the residence when the victim was murdered."
> "The evidence will show that Mr. Martinez had told his wife that the victim in this case had owed him money for drugs, and that Mr. Martinez went over there to collect that money.  That Mr. Martinez beat the victim to death with a gun.  And the evidence will also show that Mr. Johnson was not in the residence at the time of the killing.  Thank you."
> "Good morning, Ladies and Gentlemen.  One additional piece of information that the District Attorney didn't tell us is we expect the evidence is going to show that Mr. Johnson was not inside the apartment at the time that Mr. Kohn was beaten to death with a gun."
> "Good morning again, Ladies and Gentlemen.  The evidence will also show that Mr. Johnson was not in the apartment at the time Mr. Martinez killed Mr. Kohn."

Martinez did not object to any of these statements.  Johnson made no opening statement before trial.

*Martinez*, 2009 WL 2871587, at *21-22.

Martinez argues in the instant Petition that Johnson's mini-opening violated his rights to due process and confrontation "because Johnson conveyed to the prospective jury that [Martinez] personally bludgeoned Kohn to death without presenting any evidence or witnesses to support that defense and gave Martinez no opportunity to cross-examine Johnson or his counsel at trial."  He alternatively argues that the trial judge abused his discretion in allowing the mini-opening statements in spite of Martinez's objection.

As an initial matter, in denying relief on direct appeal, the Court of Appeal noted that Martinez did not object to the statements when made.  Because the state appellate court found

Martinez's claim forfeited under California's contemporaneous objection rule, the claim is procedurally defaulted from federal habeas review. *Coleman*, 501 U.S. at 729-30 (a federal court will not review a claim if the state court's rejection of the claim rests on a state law ground that is independent of the federal question and adequate to support the judgment). The Ninth Circuit has repeatedly recognized and applied the California contemporaneous objection rule in affirming denial of a federal habeas petition on grounds of procedural default where there was a complete failure to object at trial. *See, e.g.*, *Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004).

And even if the claim were not procedurally defaulted, Martinez would not be entitled to relief on it. To the extent Martinez claims that the trial judge abused his discretion, such claim is not cognizable on habeas review. Although the Ninth Circuit has suggested that an abuse of discretion may also amount to a constitutional violation, *see Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc), the Supreme Court has never held that abuse of discretion is an appropriate basis for granting federal habeas relief.[7] Indeed, quite to the contrary, the Supreme Court has strongly suggested that, while abuse of discretion is an appropriate standard on direct review, in a federal habeas proceeding it is not. *Renico*, 559 U.S. at 772-73 ("It is not even whether it was an abuse of discretion for her to have done so–the applicable standard on direct review. The question under the AEDPA is instead whether the determination of the Michigan

_____

[7]     At one time, the Ninth Circuit viewed a state court ruling to be "objectively unreasonable" if it amounted to a clear error. *Van Tran v. Lindsey*, 212 F.3d 1143, 1152-54 (9th Cir. 2000). This is the test the Ninth Circuit uses in reviewing a trial court decision under the abuse of discretion standard. *United States v. Ressam*, 679 F.3d 1069, 1086 (9th Cir. 2012) (en banc). The Supreme Court noted *Van Tran's* statement of the test and expressly rejected it as inappropriate under the AEDPA. *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (clear error standard is insufficiently deferential to state courts).

Supreme Court that there was no abuse of discretion was "an unreasonable application of . . . clearly established Federal law." (quoting § 2254(d)(1))).

Nor can Martinez demonstrate a violation of his constitutional rights.  The Supreme Court has stated that the Sixth Amendment "provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009).  If a witness does not make statements that are testimonial (either orally or in writing), then there is no Confrontation Clause violation, as there is no witness "who will bear testimony against him." *Id.*  In this case, Johnson never testified at trial, never provided a statement to police or others which was used against Martinez at trial, and never furnished the type of written statement which the Supreme Court has held to be covered by the Confrontation Clause.  His counsel's mere argument that the evidence would show that Martinez alone committed the murder, without more, does not offend the Sixth Amendment because a vital ingredient necessary to make a prima facie showing of a Confrontation Clause violation (a statement to confront) is missing.  The statement by Johnson's counsel thus did not implicate Martinez's rights under the Confrontation Clause.

Martinez nonetheless contends that the jury would infer from the statement by Johnson's counsel that counsel had received information directly from Johnson that Martinez had committed the murder.  Martinez therefore suggests that Johnson's counsel became an unsworn witness that Martinez was unable to cross-examine.  Although this Court has not found any cases discussing such claims as they involve co-defendant's counsel, a prosecutor commits misconduct when he overstates in argument the admissible evidence that he will be able to present to the jury because the prosecutor acts as his or her own unsworn witness, in violation of the defendant's

right to confront the witnesses against him.  *People v. Harris*, 767 P.2d 619 (Cal. 1989); *People v. Gaines*, 63 Cal. Rptr. 2d 188 (Cal. Ct. App. 1997); *People v. Barajas*, 193 Cal. Rptr. 750 (Cal. Ct. App. 1983).

Assuming, without deciding, that a co-defendant's counsel may similarly commit misconduct in this manner, Martinez cannot show that Johnson's counsel became an unsworn witness because the record shows that there was no variance between what counsel argued and the evidence presented.  Johnson's opening statement argued that Johnson was not present in the apartment at the time of the killing and Martinez beat the victim to death with a gun.  As Johnson's counsel argued during closing argument, while there was evidence that Johnson had been inside Kohn's apartment in the form of a bloody palm print found on the wall, there was no direct evidence that Johnson had been inside the apartment at the time of the beating.  Similarly, prospective jurors could infer from the prosecutor's opening statements during voir dire, to which Martinez does not object, as well as the evidence and testimony presented at trial, that Martinez personally beat Kohn to death with a gun.

In any event, Martinez cannot establish a due process or confrontation violation because he cannot show that the mini-opening statement "had a substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 638.  Prior to the opening statements, the court instructed the jurors that the statements made by the attorneys are not evidence, and they must decide the case based on the evidence presented at trial.  The court further explained that "evidence" consists only of sworn testimony from witnesses, exhibits entered into evidence, and "anything else" the court specifically tells them to consider.  This Court must assume in the absence of evidence to the contrary that the jury followed those

54

instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis v. Franklin*, 471 U.S. 307, 323-24 & n.9 (1985) (discussing the subject in depth).  Accordingly, the mini-opening by Johnson's counsel did not have a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 638, and the Court is without "grave doubt as to the harmlessness of [any alleged] error," *Deck v. Jenkins*, 768 F.3d 1015, 1022 (9th Cir. 2014) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995)).  The state court's rejection of Martinez's claim on this basis[8] was not contrary to, or an objectively unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, Martinez cannot prevail on this claim.

 Claim 10.  Insufficiency of the Evidence

 The case was submitted to the jury on two theories of first degree murder: 1) willful, deliberate premeditated murder and 2) felony murder with robbery or burglary as the underlying felony.  Martinez claims that his conviction for first-degree murder violates due process because there was insufficient evidence of felony murder so that theory should not have been submitted to the jury.  He asserts that there was no evidence of robbery or burglary because there was no evidence that money or property was taken from Kohn's apartment or that Martinez or Johnson had the intent to take money or property.

---

  [8]  Where the *Brecht* standard of prejudice applies, federal courts apply *Brecht* "'without regard for the state court's harmlessness determination.'"  *Deck*, 768 F.3d at 1022 (quoting *Pulido v. Chrones*, 629 F.3d 1007, 1012 (9th Cir. 2010)).  The *Deck* court explained that "AEDPA deference to the [state court's] harmlessness determination is already subsumed within the *Brecht* standard."  *Id.* at 1024 (citing *Fry v. Pliler*, 551 U.S. 112, 120 (2007)).

The Court of Appeal considered and rejected this claim on direct appeal as follows:

Where a jury is instructed on two theories of the crime and one theory is factually insufficient, the error is harmless if the alternate theory is factually sufficient "absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) Martinez contends here there is an affirmative indication the verdict rested on felony murder because in closing argument the People conceded there was no express malice, only implied malice. Since first degree murder on a theory of premeditation and deliberation requires express malice (*see People v. Moon* (2005) 37 Cal.4th 1, 29), Martinez concludes the jury must have relied solely on felony murder.

At the outset, we clarify that Martinez is not challenging the sufficiency of the evidence of premeditated and deliberate first degree murder. Nor does he challenge the sufficiency or accuracy of the instructions on first degree murder. Rather, his contention is confined to the argument that the People withdrew deliberate, premeditated murder in closing argument by conceding there was no evidence of express malice and he argues there was no evidence of robbery or burglary to support the remaining theory of felony murder.

"Robbery is the taking of 'personal property in the possession of another against the will and from the person or immediate presence of that person accomplished by means of force or fear and with the specific intent permanently to deprive such person of such property.' [Citation.]" (*People v. Lewis* (2008) 43 Cal.4th 415, 464.)

The standard of review where the sufficiency of the evidence is challenged is well established. As our Supreme Court explained in a case also involving a challenge to the sufficiency of the evidence to support a robbery felony-murder conviction, """To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt."'[Citations.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 104.)

There was ample evidence Kohn had money the night he was killed. His girlfriend testified he had large amounts of money, averaging $10,000, which he kept hidden in different spots. She was 99 percent sure he showed money that night while making marijuana sales. Tamra Valadez testified she went to Kohn's that night. She saw a two-inch stack of money in a little wooden box. She gave Kohn $50 for some marijuana; he put it in his wallet. Her cousin gave Kohn $150, which went into the box. Another visitor that day testified Kohn said he had $9,000 hidden. The visitor also witnessed a drug transaction in which Kohn purchased a pound of marijuana.

In addition, Goodwin testified about the night that Johnson came home with Martinez, carrying a shotgun. He was nervous, asked her to put the gun in the shed, and threw away his clothes. Afterwards, he had a large amount of both money and marijuana.

What Martinez contends is missing is evidence of a taking from Kohn. In closing argument, the People asserted, "So we know at the time of the homicide that he had cash

and he had at least a pound of marijuana.  And yet none was ever recovered at the crime scene by the people doing the scene processing.  It's gone."  Martinez contends there is no evidence to support this assertion.

Martinez contends this case is similar to *People v. Foss* (1927) 85 Cal.App. 269, in which the victim testified he had a roll of money before defendant beat him, but failed to testify the money was taken from him.  The court found insufficient evidence of robbery.  (*Id*. at p. 271.)

While the evidence of a taking was slight, we find it sufficient.  The People questioned a police witness about the failure to find money or a significant amount of marijuana during the search of Harris's residence.  The People failed, however, to ask the same question with regard to the search of Kohn's apartment.  There was testimony Kohn's apartment was ransacked, but not that the money and drugs were missing.  The only evidence that Kohn's money was missing after his murder came during cross-examination by Martinez.  Captain Compomizzo testified he processed Kohn's wallet and he did not recall seeing any cash, or at least any significant amount of cash.  He would have documented it if there had been cash in the wallet.[FN12]  From this evidence a reasonable jury could find the $50 Kohn put in his wallet from Valadez was taken and there was sufficient evidence of robbery.

> FN12. In closing argument, Martinez praised Captain Compomizzo as a police officer.  "He's awesome.  He knows this case backward and forward."  "He is dynamite.  He is doing his job.  And he's—he's absolutely honest."

Furthermore, even if the evidence of robbery was insufficient, there was no prejudice because the jury was instructed on a factually valid theory of first degree murder: willful, deliberate, premeditated murder.  Where there is a factually adequate theory, the conviction is usually affirmed.  "If the inadequacy of proof is purely factual, of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground."  (*People v. Guiton*, *supra*, 4 Cal.4th at p. 1129.)  In explaining that affirmance is the norm, the Guiton court explained when reversal might be required.  "We may, for example, hypothesize a case in which the district attorney stressed only the invalid ground in the jury argument, and the jury asked the court questions during deliberations directed solely to the invalid ground.  In that case, we might well find prejudice.  The prejudice would not be assumed, but affirmatively demonstrated." (*Ibid*.)

Martinez contends the jury's reliance on felony murder exclusively is affirmatively shown by the People's closing argument alone, without any questioning by the jury.  In discussing the malice necessary for first degree murder, the prosecutor argued the following: "Express malice, that's where someone usually says, I want to kill this person.  And or implied malice.  This is a case of implied malice.  How do we know it's implied malice?  Well, we don't have any statements from any of the witnesses or any statements from either of the defendants saying they wanted to kill . . . him.  So there's no express."

The prosecutor continued to argue that the severity of the beating showed implied malice and that was sufficient for first degree deliberate, premeditated murder. Finally, he urged the jury, if not convinced by his argument about malice, to find both defendants guilty of felony murder.

The prosecutor's argument was legally incorrect; first degree, deliberate and premeditated murder requires express malice. (*People v. Knapp* (1886) 71 Cal. 1, 6.) But he was also incorrect that the evidence did not show express malice. Express malice requires a manifestation of "a deliberate intention unlawfully to take away the life of a fellow creature." (§ 188.) The words of defendant are not necessary to show express malice; express malice may be inferred from the defendant's acts and the circumstances of the crime. (*People v. Smith* (2005) 37 Cal.4th 733, 741.) Beating a person to death manifests an intent to kill sufficient to find express malice. (*See People v. Weatherford* (1947) 78 Cal.App.2d 669, 686.)

We do not read the People's argument to abandon the theory of deliberate, premeditated murder as a theory of first degree murder. The prosecutor did argue the evidence showed premeditation and deliberation, focusing on testimony that both Martinez and Johnson wore dark clothing and Martinez said he parked away from the residence to not leave tire tracks. Martinez does not contend the evidence is insufficient to show deliberate, premeditated murder.

Although the prosecutor misstated the law, the jury was properly instructed on express malice. "The defendant acted with express malice if he unlawfully intended to kill." The jury was also instructed it must follow the law and "[i]f you believe that the attorney['s] comments on the law conflict with my instructions, you must follow my instructions." As noted above, we presume the jury followed the court's instructions. (*People v. Smith* (2007) 40 Cal.4th 483, 517; *People v. Mickey*, *supra*, 54 Cal.3d at p. 689, fn. 17.) Martinez has failed to demonstrate prejudice under *Guiton*.

*Martinez*, 2009 WL 2871587, at *26-29.

As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard). This Court must therefore determine whether the California court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the

evidence at trial.  *Jackson*, 443 U.S. at 318-19.  Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution."  *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law.  *See Engle v. Isaac*, 456 U.S. 107, 128 (1982).  Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law.  *Jackson*, 443 U.S. at 324 n.16.  A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").  "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension."  *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

Martinez contends that the evidence was insufficient to establish that any money had been taken from Kohn because it was based on "only speculation and conjecture."  Pet. at 69.  But, as the Court of Appeal's summary of the evidence shows, the prosecutor relied on circumstantial evidence to support a felony-murder theory.  Circumstantial evidence alone is sufficient to support a conviction.  *See Jackson*, 443 U.S. at 324-25; *Schad v. Ryan*, 671 F.3d

708, 717 (9th Cir. 2011) ("Circumstantial evidence and reasonable inferences drawn from it may properly form the basis of a conviction.").

Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. *Schlup*, 513 U.S. at 330. The United States Supreme Court has recently even further limited a federal court's scope of review under *Jackson*, holding that "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam). *Jackson* "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Id.* at 3-4. Under *Cavazos*, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* at 4 (*quoting Renico v. Lett*, 559 U.S. 766, 773 (2010)).

Although it might have been possible to draw a different inference from the evidence, this Court is required to resolve that conflict in favor of the prosecution. *See Jackson*, 443 U.S. at 326. For the reasons enumerated by the Court of Appeal and viewing the evidence in the light most favorable to the verdict, the record does not compel the conclusion that no rational trier of fact could have found proof that Martinez killed Kohn during the commission of a robbery. Thus, considering the deference owed under *Jackson*, *Cavazos*, and the AEDPA, this Court concludes that, although slight, there was sufficient evidence introduced at trial from which a

rational trier of fact could have found beyond a reasonable doubt that Martinez was guilty of first-degree murder under a felony-murder theory.

Moreover, Martinez fails to show that the Court of Appeal's alternate finding that there was sufficient evidence of willful, deliberate, and premeditated murder to sustain Martinez's conviction was either unreasonable or contrary to federal law.  Assuming *arguendo* that there was insufficient evidence presented at trial to support the conviction on a felony murder theory, federal law is in line with California law in holding that a verdict may not be negated "merely on the chance . . . that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient." *Griffin v. United States*, 502 U.S. 46, 59-60 (1991) (internal citation and quotation marks omitted).  "When two theories are presented to a jury and one is *factually* insufficient, a conviction may be upheld, because a jury is 'equipped to analyze the evidence' and so a court may assume that it rested its verdict on the ground that the facts supported."  *Keating v. Hood*, 191 F.3d 1053, 1062 (9th Cir. 1999), abrogated on other grounds, *Mancuso v. Olivarez*, 292 F.3d 939, 944 n.1 (9th Cir. 2002) (quoting *Griffin*, 502 U.S. at 59); *see also People v. Guiton*, 847 P.2d 45, 52 (Cal. 1993) ("If the inadequacy of proof is purely factual, of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground.").

Because, as the Court of Appeal recognized, Martinez does not challenge the sufficiency of the evidence to prove willful, deliberate, and premeditated murder, the issue is whether the jury found Martinez guilty solely on an unsupported felony murder theory or whether it could have found him guilty of willful, deliberate, and premeditated murder.  Here, the state court

61

reasonably concluded that the prosecutor's erroneous argument involved only a brief misstatement of law and could not be construed as an abandonment of a theory of first degree murder.  And regardless of the prosecutor's mistake, the court instructed the juror prior to closing argument that they must "follow the law as I explain it to you, even if you disagree with it" and that, if they "believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions" before properly instructing the jury on the definitions of express and implied malice.  Accordingly, the state court's conclusion that the jury could lawfully have found Martinez guilty of willful, deliberate, and premeditated murder was neither unreasonable nor contrary to federal law.  Martinez is thus not entitled to relief on his insufficiency of the evidence claim because the evidence was sufficient to sustain Martinez's conviction under either theory.

    Claim 11.       Erroneous Restitution Order

       Finally, Martinez challenges the propriety of the trial court's restitution order.  He contends that the sentencing court "exceed[ed] its sta[t]utory power in imposing restitution" that was "inappropriate considering [his] potential prison earnings."  He further claims that counsel was ineffective for failing to object to the order at sentencing.

       A petition for a writ of habeas corpus can be entertained only on the ground that the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  The Ninth Circuit has held that "§ 2254(a) does not confer jurisdiction over a habeas corpus petition raising an in-custody challenge to a restitution order." *Bailey v. Hill*, 599 F.3d 976, 984 (9th Cir. 2010) (footnote omitted).  "[T]he remedy that [Petitioner] seeks, the elimination or alteration of a money judgment, does not directly impact—and is not

directed at the source of the restraint on—his liberty." *Id.* at 981.  A federal court, then, lacks

jurisdiction to hear claims that challenge the money portion of a state judgment, such as a

restitution order, which does not affect the duration of custody.  *Id.*

Moreover, Martinez's claim that the restitution order was unauthorized by California law

is a state-law claim which is beyond the purview of this Court in a federal habeas proceeding.

*Swarthout*, 131 S. Ct. at 863; *see also Bell v. Cone*, 543 U.S. 447, 455 (2005).  And, because a

claim challenging a restitution order is not cognizable on habeas review, so is a claim asserting

that counsel was ineffective in connection with a restitution order.  *Bailey*, 599 F.3d at 981-82

(citing *Washington v. Smith*, 564 F.3d 1350, 1350 (7th Cir. 2009)) (affirming rejection of habeas

ineffective assistance of counsel claim based on counsel's failure to challenge restitution order

because restitution does not affect duration of custody).  Martinez therefore cannot prevail on

any argument advanced in support of this claim.

## V. CONCLUSION AND ORDER

Martinez is not entitled to relief on any ground raised in his Amended Petition.

**IT IS THEREFORE ORDERED THAT** the Amended Petition under 28 U.S.C. § 2254

for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of

Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain

a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree

with the district court's resolution of his constitutional claims or that jurists could conclude the

issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the

Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: May 11, 2015.

    /s/James K. Singleton, Jr.     
JAMES K. SINGLETON, JR.
Senior United States District Judge
